FOREST HOME DODGE, INC., and another, Plaintiffs and Respondents, v. KARNS, Commissioner of Motor Vehicle Department, Defendant and Appellant: DOERING MOTOR COMPANY and others, defendants.*

*November 2—November 30, 1965.*

* Motion for rehearing denied, with costs, on February 1, 1966.

82

For the appellant the cause was argued by *LeRoy L. Dalton,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondents there were briefs by *Whyte, Hirschboeck, Minahan, Harding & Harland,* attorneys, and *Victor M. Harding* and *Richard D. Silberman* of counsel, all of Milwaukee, and *Hart, Kraege, Jackman & Wightman,* attorneys, and *W. L. Jackman* of counsel, all of Madison, and oral argument by *W. L. Jackman* and *Victor M. Harding.*

A brief *amicus curiae* was filed by *Wheeler, Van Sickle, Day & Goodman* and *Roland B. Day,* all of Madison, for the Wisconsin Automotive Trades Association.

HEFFERNAN, J.

"Qui facit per alium facit per se."

Broom's Legal Maxims, p. 639
London, 1911

This being an appeal from the decision of an administrative agency, the courts are governed by the provisions of sec. 227.20, Stats. That portion of the statutes allows a decision to be reversed or modified if the appellant is prejudiced as the result of the administrative findings, inferences, conclusions, or decisions, being unsupported by substantial evidence in view of the record as a whole. The same statute also directs the courts to accord due weight to the experience, technical competence, and specialized knowledge of the agency involved.

At the time of the hearing before the commissioner, it was agreed that there were but two issues. They are (1) is Forest Home a replacement dealership for Earl Smith Agency, and (2) have the objecting dealers "who constitute the presently enfranchised dealers complied with the agreed requirements of the manufacturer for adequate representation?" In addition, the applicant,

Forest Home, objected to the ruling that the application of Forest Home was, in fact, that of a manufacturer.

In the event this was not a "dealer application of a manufacturer," sec. 218.01(3)(f), Stats., is not applicable. We conclude, however, that the application made in the name of Forest Home was the "dealer application of a manufacturer."

The statute, however, is not unambiguous. It is, therefore, necessary to construe it in light of its purpose, and consideration must be given to statutes that are *in pari materia*. Sec. 218.01 (3), Stats., is a part of the Wisconsin Auto Dealership Law, which was enacted in 1935 (ch. 474, Laws of 1935). Implicit in this law is the recognition of the gross disparity of bargaining power between the manufacturer of automobiles and the local retailer. It was enacted in recognition of the long history of the abuse of dealers by manufacturers. *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 71 N. W. (2d) 420. These laws deal with the relationship between auto manufacturers and auto dealers. The purpose of the law is to furnish the dealer with some protection against unfair treatment by the manufacturer. Sec. 218.01 (3) (f) was enacted into law in 1955 (ch. 364, Laws of 1955). Earlier enactments had guarded against specific evils occasioned by what the legislature considered the unfair or overreaching tactics of manufacturers, *e.g.*, forced acceptance of unordered autos or parts (218.01 (3) (a) 15) ; coercion or unfair treatment through threat of cancellation (218.01 (3) (a) 16) ; unfair cancellation or refusal to renew franchises, or without due regard to the equities of the dealer (218.01 (3) (a) 17).

We agree with the attorney general that the legislative history clearly shows that sec. 218.01 (3) (f), Stats., was a part of this general pattern of regulation, and that it was designed to prevent the manufacturer from accomplishing indirectly by new, manufacturer-controlled dealerships what the law did not permit to be done

directly. With superior resources to spend on facilities, advertising, etc., and with no problem in placing orders with a distributor or manufacturer, a dealer who, in fact, is a manufacturer or controlled by a manufacturer is at a distinct advantage and can use that advantage to accomplish by indirection what is otherwise prohibited by law.

The ambiguity of the statute should be resolved in a manner that will effectuate the legislative intent. Bearing in mind the purpose of sec. 218.01 (3) (f), Stats., as shown by its history and place in the context of the law regulating manufacturers, it is apparent that it is a remedial statute and should be construed to effect its purpose.

"The construction of the statute should be made with reference to the purpose of the statute, or in the light thereof, and in harmony and conformity therewith, in order to aid, advance, promote, subserve, support, and effectuate such aim, design, motive, end, aspirations, or object." 50 Am. Jur., Statutes, p. 286, sec. 303.

It is obvious on its face that the statute in question at least includes the situation where the manufacturer is itself the applicant. In view of the purpose of the statute, however, it would be naive to assume that its effect was limited to this situation.

The statute if so interpreted would be, in effect, useless and would be contrary to the general tenor of the entire statutory scheme that indirect coercion is prohibited. The whole framework of the laws shows that the manufacturer, with his superior bargaining power, is not to be unsupervised in his dealings with the small independent dealer; and that the state, acting through the motor vehicle department, must see to it that the elements of fairness and freedom in bargaining between the parties continue to exist. We cannot, in view of the clearly expressed legislative intent, assume that the law passed was intended as a nullity to be evaded by operating

through an individual under contract to the manufacturer or by the device of a subsidiary corporation.

We conclude, therefore, that the conduct prohibited by sec. 218.01 (3) (f), Stats., includes the situation in the instant case where there is an objective showing that the manufacturer controls the license applicant. There need be no showing that there is an intent to evade the statute or that the particular transaction is intended to further unfair treatment of the dealers by the manufacturer. It is enough that the facts adduced at the hearing are sufficient to show that in effect the applicant is the creature of the manufacturer. It is enough to show the element of control. A review of the evidence reveals that there was substantial evidence to support the commissioner's conclusion.

The original application by Forest Home revealed that it was owned 100 percent by Chrysler Motors, a wholly owned subsidiary of the Chrysler Corporation. At the hearings, all witnesses were employees of Chrysler Motors, not of the corporation ostensibly seeking the license. When a change was made in the corporate ownership and a Mr. Caldwell purchased 25 percent of the stock, it was a communication on the letterhead of Chrysler Motors that informed the commissioner of that fact. It was admitted that Chrysler Motors continued to own 75 percent of the stock of Forest Home. It is clear from the evidence that the effect of these intercorporate holdings was to vest control of Forest Home in the manufacturer, the Chrysler Corporation, in direct contravention of the statute if, in fact, the existing dealers were living up to the manufacturer's agreed requirements. No finding of fact is required to support the commissioner's conclusion in this regard. The ultimate fact of manufacturer control is uncontroverted by the evidence. Additionally, where the evidence is clear and convincing, this court, or the trial court, can supply a finding of fact where it might be required. *Barnes v. State* (1964), 25 Wis. (2d) 116, 122, 130 N. W. (2d) 264.

The petitioners (Forest Home and Chrysler Motors) argue, however, that this is a mere financing device to "assist otherwise qualified new dealers who lack sufficient capital in becoming established through temporary capital financing arrangements." They point to the case of *National Bond Finance Co. v. General Motors Corp.* (D. C., W. D. Mo. 1964), 238 Fed. Supp. 248, in support of their position. That case has no relevancy to the instant one. The *National Bond Case* involved a situation wherein the finance company was a creditor of the General Motors dealer. It sought to "pierce the corporate veil" in a common-law creditor's action to hold General Motors liable for the debts of the dealer on the basis that General Motors was a stockholder. General Motors successfully defended by showing that the dealer was contractually obligated to buy out General Motors' interest in the dealership. The dealer was obligated "to apply *all* of his dividends and at least 50 percent of his bonus" to purchase the stock held by General Motors.

There is no doubt that this constituted a *bona fide* attempt by General Motors to finance an independent dealer. The contract provided for mandatory termination of financial control. This is unlike the mere option that was given to Mr. Caldwell in the case before the court. We do not by thus distinguishing the case imply that a *bona fide* temporary financing as used by General Motors satisfies the requirements of the statute. We refer to this case to distinguish the petitioners-respondents' argument. In *National Bond* an attempt was made to "pierce the corporate veil" and to set it aside as a nullity. We do not do so, nor is it necessary to "pierce the corporate veil" in this opinion. Rather, we expressly recognize the separate corporate entities, but in addition recognize that the succession of corporate stockholdings vest majority ownership and, hence, control of Forest Home in the Chrysler Corporation so as to constitute a "dealer application of a manufacturer."

Sec. 218.01 (3) (f), Stats., has been construed to be applicable to new dealerships only and not to dealerships that are mere replacements. No such exception appears on the face of the statute, and this construction has been reached in the practical administration of the statute by the commissioner. Apparently, all the parties hereto concede the correctness of this construction. Under this agreed construction, if Forest Home is a replacement of an existing agency, the application will not be denied though it is a dealer application and though the other dealers have met the minimum agreed requirements. The commissioner found as a matter of fact that the proposed Forest Home Agency was not a replacement, but was a new place of business. Although there is some evidence to the contrary, there is substantial evidence to support the finding: There was a lapse of a full model year between the demise of the Earl Smith Agency and application for Forest Home; the new agency was at a distance of nine and one-half miles from the location of the Earl Smith Agency; Forest Home was to have as its sales area the whole of Milwaukee county, while the Earl Smith area was Cudahy and South Milwaukee. The representative of Chrysler Motors stated that had Earl Smith stayed in business, Chrysler Motors would still have wanted a dealership in the proposed location for Forest Home. The representatives referred to Earl Smith as a "little dealer," while Forest Home was to be a substantially larger enterprise. Without a doubt, there was substantial evidence to sustain the findings of the commissioner that this was a new dealership and not a replacement.

In addition to the requirement discussed above, sec. 218.01 (3) (f), Stats., directs that the commissioner "shall deny the dealer application of a manufacturer in any community or territory where the presently en-franchised dealer or dealers have complied with agreed requirements of such manufacturer for adequate repre-sentation in such community or territory."

The Dodge Direct Dealer Agreement, uniformly used throughout the United States, contains the following provisions:

"DIRECT DEALER agrees to sell energetically at retail in the Sales Locality described in Paragraph 1 of this agreement Dodge passenger cars and Dodge passenger car parts and accessories. DIRECT DEALER agrees to sell at retail in such Sales Locality the number of new Dodge passenger cars necessary to fulfill DIRECT DEALER'S Minimum Sales Responsibility, as defined below.

"DIRECT DEALER'S Minimum Sales Responsibility will be determined as follows:

"From time to time, but at least once a year, DODGE will compute the ratio of the number of new Dodge passenger cars registered in the most recent 12-month period for which registration figures are available in the Dodge Sales Region in which DIRECT DEALER is located to the number of all new passenger cars so registered in that Region. The ratio thus obtained will be applied to the number of all new passenger cars registered during the same 12-month period in DIRECT DEALER'S Sales Locality. The resulting number (and the percentage share of market that such number represents for the Sales Locality) will be DIRECT DEALER'S Minimum Sales Responsibility for this same twelve (12) month period, subject to such adjustment as is described below."

Sec. 218.01 (2) (bc), Stats., requires that every dealer or distributor of automobiles shall file with the commissioner his written agreement. Sec. 218.01 (2) (bd) 1 permits the filing of a single basic agreement to cover all dealerships if, in fact, all Dodge dealers are covered by an identical agreement and one has been filed. The paragraphs quoted above are portions of the agreement that was filed by Chrysler Motors pursuant to this statutory directive. In addition to outlining the minimum sales requirements (*supra*), this agreement provides that the dealer shall furnish adequate service facilities, basic and necessary tools, adequate sales room space, and maintain sufficient working capital, all for the purpose of rendering "prompt, efficient and courteous service."

Respondent contends that this is not the agreement required by sec. 218.01 (3) (f), Stats., that this is merely a delineation of a minimum sales responsibility which if not met by the dealer can result in cancellation. Respondent contends that there is in fact no "agreed requirement of such manufacturer for adequate representation." That there being none, the dealers are defenseless if the manufacturer or distributor chooses to claim that they have not met the agreed requirements for adequate representation.

The commissioner, however, did conclude that the filed franchise agreements, in which the dealer not only agrees "to sell energetically" and at least up to a certain ratio, but also agrees to maintain a certain standard of equipment and service, constitutes the document which defines the "agreed requirement of such manufacturer for adequate representation." An examination of the document which appears in the record is sufficient to sustain that conclusion. Numerous provisions refer to factors other than minimum sales requirements. For example, paragraphs are devoted to advertising, keeping of records, placing of orders, delivery of automobiles, price changes, sale and supply of parts, and handling of collections. Even the rights of the dealer's widow is included. The document itself is entitled "Dodge Direct Dealer Agreement—Terms and Provisions." There is no doubt that this "Direct Dealer Agreement" on its face constitutes the obligation that the distributor or manufacturer has placed upon the dealer for representation. If the dealer meets those standards, he has complied with the only requirement for adequate representation that exists. There is evidence that the objecting dealers did meet the requirements imposed by the contract, and in regard to the sales requirements, the commissioner found and there is ample evidence to support the finding that the objecting dealers had maintained and exceeded the contractual requirements.

As a final argument, the respondent contends that, since the statute includes manufacturers applying for new dealership license, but not to a manufacturer who acquires control of an existing dealership or who seeks a license for a replacement dealership, the statute is unconstitutional on the basis that the classification is unreasonable. Implicit in his argument is that the same evils exist in all manufacturer-controlled dealerships. While this may be a reasonable assumption, the legislature, in its wisdom, has not seen fit to proscribe all such transactions. This court has clearly stated that a classification is not unreasonable merely because all possible similar evils are not dealt with at one time.

In *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 503, 71 N. W. (2d) 420, in answering a similar attack, this court said:

"While all the citizens of the state are entitled to be protected against unfair dealing by others, this does not mean that the legislature must by one sweep prohibit all unfair dealing and cannot proceed piecemeal to remedy particular types of unfair dealing which manifest themselves in particular occupations or industries. On this point it is only necessary to quote further from *Williamson v. Lee Optical Co., supra* (348 U. S. 488):

" 'Secondly, the district court held that it violated the equal-protection clause of the Fourteenth amendment to subject opticians to this regulatory system and to exempt, as sec. 3 of the act does, all sellers of ready-to-wear glasses. The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. Texas*, 310 U. S. 141 [60 Sup. Ct. 879, 84 L. Ed. 1124]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners*, 294 U. S. 608 [55 Sup. Ct. 570, 79 L. Ed. 1086]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A. F. of L. v. American Sash Co.* 335 U. S. 538 [69 Sup. Ct. 258, 93 L. Ed. 222]. The pro-

hibition of the equal-protection clause goes no further than the invidious discrimination.' "

This court in *Kreutzer v. Westfahl* (1925), 187 Wis. 463, 483, 204 N. W. 595, quoted with approval the declaration of Mr. Justice Holmes in *Keokee C. C. Co. v. Taylor*, 234 U. S. 224, 34 Sup. Ct. 856, 58 L. Ed. 1288.

" '. . . it is established by repeated decisions that a statute aimed at what is deemed an evil, and hitting it presumably where experience shows it to be most felt, is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see. That is for the legislature to judge unless the case is very clear.' "

Nor is the statute in violation of the United States constitution as an undue burden on interstate commerce. A statute is presumptively constitutional, and, in the absence of a clear showing that it is not, it will be held to be constitutionally proper. In this case, in the absence of a showing that it does in fact result in an undue burden on interstate commerce, that presumption will be given effect. Statutes are presumed to be valid and constitutional, and a party attacking a statute as unconstitutional has the burden of proof. 16 C. J. S., Constitutional Law, p. 388, sec. 99. *Smith v. Brookfield* (1956), 272 Wis. 1, 74 N. W. (2d) 770. While admittedly in this particular case the transactions between a Dodge dealer and the manufacturer or distributor are transactions in interstate commerce, there is no evidence that there is a burden on interstate commerce or that the burden is "undue." It should be noted, moreover, that the same provision is applicable to a domestic manufacturer, and is not thus discriminatory to a manufacturer who ships his automobiles from out of the state. The respondent has failed to assume the burden of showing in what manner, if any, the statute is unconstitutional.

It is clear that the manufacturer is not foreclosed from selling directly, if he sees fit to acquire an existing

dealership. The record shows that during the course of these proceedings, Chrysler Motors did acquire the controlling interest in Edwards Motors, one of the original objectors herein. In view of the failure of the respondent to assume his burden of proof, we conclude that the rule as stated in *State v. Helwig* is applicable here.

". . . the state may adopt proper regulations in the interests of the peace, safety, and welfare of its residents in the absence of a federal statute either dealing with or pre-empting the field, or unless the state regulation discriminates against persons engaged in interstate commerce or places an undue burden thereon." *State v. Helwig* (1952), 262 Wis. 299, 302, 54 N. W. (2d) 907.

There is no claim that this field of regulation has been pre-empted by federal legislation. The statute on its face appears to be a proper exercise of the police power and is presumptively constitutional.

The statute in question is not so vague as to be unconstitutional. While the meaning of certain portions of it may be disputed, it is the duty of the court to construe the statute in accordance with its legislative intent.

In 50 Am. Jur., Statutes, p. 489, sec. 473, it is stated:

"A statute is not necessarily void merely because it is vague, indefinite, or uncertain, or contains terms not susceptible of exact meaning, or is stated in general terms, or prescribes a general course of conduct, or does not prescribe precise boundaries, or is imperfect in its details, or contains errors or omissions, or because the intention of the legislature might have been expressed in plainer terms, and questions may arise as to its applicability, and opinions may differ in respect of what falls within its terms, or because the statute is difficult to execute."

Unless a statute is so vague and uncertain that it is impossible to execute it or to ascertain the legislative intent with reasonable certainty, it is valid. *Marshfield v. Cameron* (1964), 24 Wis. (2d) 56, 61, 127 N. W. (2d) 809; 82 C. J. S., Statutes, p. 113, sec. 68. It clearly cannot

be said that the statute in question here is in that category.

Nor do we find that this statute is invalid as an improper delegation of legislative power. The statute properly construed clearly sets the standards that authorize the denial of a license. We do not find the conduct of the commissioner in this case arbitrary or capricious, but within the scope of his properly delegated authority.

*By the Court.*—Judgment reversed.