HM DISTRIBUTORS OF MILWAUKEE, INC., Appellant, v.
DEPARTMENT OF AGRICULTURE, Respondent.*

*No. 418.   Argued June 6, 1972.—Decided June 30, 1972.*
(Also reported in 198 N. W. 2d 598.)

* Motion for rehearing denied, with costs, on September 6, 1972.

For the appellant there were briefs by *Westring &
Martinson, Chartered,* of Green Bay, and by *Walther &
Halling* of Milwaukee, attorneys, and *Richard W. West-
ring* of Green Bay, and *David L. Walther* and *Virginia
W. Speery,* both of Milwaukee of counsel, and oral argu-
ment by *David L. Walther* and *Richard W. Westring.*

For the respondent the cause was argued by *Bruce A.
Craig,* assistant attorney general, with whom on the brief
was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. By terms of an action for
declaratory relief, the proper procedure,[1] the plaintiff
challenges a statute and rules of the state Department
of Agriculture.

*The statute.*

The statute involved authorizes the state Department
of Agriculture to issue orders forbidding methods of
competition in business or trade practices in business
which are determined by the department to be unfair.[2]

---

[1] Sec. 227.05, Stats., provides: "(1) Except as provided in sub.
(2), the exclusive means of judicial review of the validity of a
rule shall be an action for declaratory judgment as to the validity
of such rule brought in the circuit court for Dane county. . . ."

[2] Sec. 100.20, Stats., entitled "**Methods of competition and trade
practices,**" provides:

"(1) Methods of competition in business and trade practices in
business shall be fair. Unfair methods of competition in business
and unfair trade practices in business are hereby prohibited.

"(2) The department [of agriculture], after public hearing, may
issue general orders forbidding methods of competition in business
or trade practices in business which are determined by the depart-
ment to be unfair. The department, after public hearing, may issue
general orders prescribing methods of competition in business or

*The rules.*

Following a public hearing on the proposed rules, the state Department of Agriculture issued the rules prohibiting the promoting, offering or granting of participation in a "chain distributor scheme," defining the term as a sales device whereby a person making an investment is granted a license to recruit for profit one or more additional persons who are then granted such license to recruit.[3]

*The trade practice.*

It is not disputed that one phase of the marketing program of plaintiff-appellant collides head on with the quoted rules. The challenge is to the validity of the rules and of the statute which authorized them. Not involved in the collision is the general distribution setup for the

---

trade practices in business which are determined by the department to be fair."

[3] "Ag 122.03 **Prohibition.** No person shall promote, offer or grant participation in a chain distributor scheme.

"Ag 122.02 **Definitions.** (1) 'Chain distributor scheme' is a sales device whereby a person, upon a condition that he make an investment, is granted a license or right to recruit for profit one or more additional persons who also are granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition. . . .

"Ag 122.01 **Unfair trade practice.** The promotional use of a chain distributor scheme in connection with the solicitation of business investments from members of the public is an unfair trade practice under section 100.20, Wis. Stats. When so used the scheme serves as a lure to improvident and uneconomical investment. Many small investors lack commercial expertise and anticipate unrealistic profits through use of the chance to further perpetuate a chain of distributors, without regard to actual market conditions affecting further distribution and sale of the property purchased by them or its market acceptance by final users or consumers. Substantial economic losses to participating distributors have occurred and will inevitably occur by reason of their reliance on perpetuation of the chain distributor scheme as a source of profit."

marketing program for plaintiff-appellant's products. The multilevel structure begins with a door-to-door sales person, who purchases her supplies from an "organizer" who purchases the products from a "master distributor" who receives his materials from the company, but pays for them through a "general distributor." It is at the level of the "general distributor" that the chain distributor scheme is introduced.

A person can work his way up through the organization to become a "general distributor" or can "buy in." In either case, the total payment is $6,500—$3,500 is for products; $3,000 is an "escrow" payment to be held by the company until the new "general distributor" recruits a "master distributor." Additionally, each time an existing "general distributor" recruits a new "general distributor" it appears that he is to be paid $4,299 and it is specifically represented that ". . . if you did this once each month for the next year . . . you would have earned $51,588 at the end of twelve months. . . ." This is a summarization, but no more is needed where it is conceded that the practice of plaintiff-appellant is prohibited by the rules issued by the agriculture department.

*The issues raised.*

In seeking declaratory judgment, the plaintiff-appellant argues that the agriculture department's rules (1) exceed the statutory authority of the department; (2) were not promulgated in accordance with the rulemaking procedures required; (3) are vague and overbroad; and (4) violate constitutional rights of freedom to make economic investments and freedom of speech. Each issue raised will be dealt with separately.

*Statutory authority exceeded?*

Sec. 100.20 (1), Stats., prohibits both "unfair methods of competition in business" and "unfair trade practices."

The plaintiff-appellant finds the use of both terms conjunctively a redundancy. The contention is that the term "unfair trade practices" is contained within and limited to "unfair methods of competition." If accepted, this narrowed interpretation would leave competitors the sole category sought to be protected by the legislative enactment. It would leave investors, purchasers and others outside the list of those affected by "unfair trade practices." Such construction would hardly give effect to all parts of the statute.[4] When the term "unfair trade practice" was added to "unfair methods of competition in business," the mantle of protection against unfair practices was extended beyond those engaged in making or selling the same or similar products. We hold that the agriculture department was entitled to act to protect those, other than business competitors, injured or affected by unfairness in trade practices. As the United States Supreme Court said, quoting the language of the Congress of the United States, in explaining why the words "unfair or deceptive acts or practices" were added to a federal statute which had previously prohibited only "unfair methods of competition :"

" '. . . this amendment makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.' " [5]

The trial court in this case held: "Schemes which can cause the loss of money and the victimization of third persons clearly fall within the term 'unfair trade practices' . . . The authority granted to the department to regulate 'unfair trade practices' was properly exercised

[4] *State ex rel. Knudsen v. Board of Education* (1969), 43 Wis. 2d 58, 65, 168 N. W. 2d 295.

[5] *FTC v. Sperry & Hutchinson Co.* (1972), 405 U. S. 233, 244, 92 Sup. Ct. 898, 31 L. Ed. 2d 170, interpreting 15 United States Code, sec. 45 (a) (6), part of sec. 5 of the Trade Commission Act.

within its statutory authority." We agree, and, as a postscript, repeat what this court, many years ago, had to say about the chain letter idea used as a trade practice:

". . . the real arrangement was a joint scheme to make money by selling similar nominal territorial rights to others who should also become parties to the scheme and sell similar territorial rights to still others, and so on . . . .

". . . it will infallibly leave a greater or less crowd of dupes at the end with no opportunity to recoup their losses because the bubble has at last burst. It contemplates an endless chain of purchasers, or, rather, a series of constantly multiplying endless chains, with nothing but fading rainbows as the reward of those who are unfortunate enough to become purchasers the moment before the collapse of the scheme. . . .

"Such an enterprise we regard as contrary to public policy and void. . . ." [6]

### Procedure proper?

Plaintiff-appellant contends that proper and required rulemaking procedures were not followed in the adoption of the no-chain distributors' rules. Three points are argued:

(1) *That the required public hearing was held on proposed rules, not adopted rules.* The purpose of a public hearing is to give interested parties not only a chance to be heard, but to have an influence in the final form of the regulations involved. That purpose would not be served if the adopted rules were required to be identical in form to those proposed before the hearing. A question of the need for an additional hearing might well arise where the rules as adopted bore little resemblance to the rules as proposed. Here, where the rules as proposed vary from the rules as adopted only in details of wording and where the scheme prohibited

[6] *Twentieth Century Co. v. Quilling* (1907), 130 Wis. 318, 323, 324, 110 N. W. 174.

was identical in both, we see no basis for complaint, much less for successful challenge.

(2) *That the statutory requirement [7] of ". . . a summary of the factual information on which its proposal is based . . ." was not met.* The trial court specifically found that such summary was presented and that it related to the rules in question. Additionally, the trial court found that: ". . . No evidence was presented which would indicate that the basic procedures were not followed. . . ." The issue involves a question of fact, and the trial court ruling resolves it. On this record, as to this challenge, it is difficult to see how any other finding of fact could have been made.

(3) *That the department failed to comply with the statutory requirement [8] that ". . . The agency shall keep minutes or a record of the hearing in such manner as it determines to be desirable and feasible."* It is conceded that a tape-recorded record of the hearing was kept, but plaintiff-appellant contends this does not meet the statutory requirement. The wording of the statute gives the administrative agency wide latitude in determining the means by which a record of the proceedings are to be kept. The trial court's finding that the tape recording was adequate is sustained, particularly because the plaintiff-appellant failed to show that it was in any way denied access to the recording made and record kept.

*Void for vagueness?*

The focus of attack here is on words used in the rules as promulgated, the claim being that they are inadequately defined. As to some of the words challenged, any standard or law dictionary gives a clear and accepted definition. A "promoter" is a person "who promotes, urges on, encourages, incites, advances, etc." [9] and

---

[7] Sec. 227.022 (1), Stats.

[8] Sec. 227.022 (2), Stats.

[9] Black's, *Law Dictionary* (rev. 4th ed. 1968), page 1379.

"promotion" is the act of doing just that. "Recruiting" is "the raising of recruits," [10] and a "recruit" is "a newcomer to a field of activity." [11] "Recruiting for profit," in the context of these rules, occurs when any person makes money by inducing another to purchase a right or license authorizing the purchaser to also sell such licenses, carrying on the chain of recruitment of license holders. (The label of "stipulated damages" for the asserted economic loss done by the introduction of a new member does not change the realities of the scheme. Whether the person recruited for profit was or was not already somewhere in the distribution system of the plaintiff-appellant would not change the fact that recruitment for profit under the scheme takes place when any nonlicense holder is induced to purchase a license in the chain distributor scheme.)

As to two other words challenged, "investment" and "chain distributor scheme," they are clearly and adequately defined in the department rules. "Investment" is sufficiently defined as "any acquisition, for a consideration other than personal services, of personal property, tangible or intangible, for profit or business purposes. . . ." [12] The key phrase, "chain distributor scheme" is very precisely defined in the rules. [13] Clearly stated in the definition are these elements: (1) A person must be granted a license or right, (2) in return for an investment, (3) which gives him the right to recruit for profit, (4) persons to whom similiar licenses are granted, (5) in return for an investment. Explicit lan-

---

[10] Webster's, *New International Dictionary* (3d ed., unabridged), page 1899.

[11] *Id.* at page 1899.

[12] Ag 122.02 (2) further states: ". . . and includes, without limitation, franchises, business opportunities and services. It does not include real estate, securities registered under chapter 551, Wis. Stats., or sales demonstration equipment and materials furnished at cost for use in making sales and not for resale."

[13] *See:* Ag 122.02 (1) quoted in fn. 3, *supra.*

guage in the rules answers plaintiff-appellant's suggestion that its limit of one "general distributor" per ten thousand of population rescues the scheme from illegality. It does not.[14]

In setting the standard for certainty of language in statutes, and certainly the certainty required in administrative rules would be no greater, this court said: "Unless a statute is so vague and uncertain that it is impossible to execute it or to ascertain the legislative intent with reasonable certainty, it is valid. . . ."[15] The rules here challenged meet the test and are not void for vagueness.

*Constitutional rights invaded?*

Plaintiff-appellant finds two constitutional rights invaded by the agriculture department's rules: (1) The right of a person to make the economic investment he chooses; and (2) the right of freedom of speech.

"Upon proper disclosure of information," plaintiff-appellant's brief contends, "a person has the right to make the economic investment he chooses." Every bucket

---

[14] Ag 122.02 (1) specifically provides: ". . . A limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for the above license or right to recruit or the receipt of profits therefrom, does not change the identity of the scheme as a chain distributor scheme."

[15] *Forest Home Dodge, Inc. v. Karns* (1965), 29 Wis. 2d 78, 94, 138 N. W. 2d 214, quoting with approval 50 Am. Jur., *Statutes*, p. 489, sec. 473, stating: " 'A statute is not necessarily void merely because it is vague, indefinite, or uncertain, or contains terms not susceptible of exact meaning, or is stated in general terms, or prescribes a general course of conduct, or does not prescribe precise boundaries, or is imperfect in its details, or contains errors or omissions, or because the intention of the legislature might have been expressed in plainer terms, and questions may arise as to its applicability, and opinions may differ in respect of what falls within its terms, or because the statute is difficult to execute.' "

shop operator would applaud the statement, although he might be surprised to have it claimed that the right of his customers to be defrauded is somewhere in the United States Constitution. The proverb stated that "A fool and his money are soon parted," but we did not suspect that accelerating the parting enjoyed constitutional protection. The plaintiff-appellant does concede to government the right to "protect the public from fraud," but contends "it cannot prevent a citizen from knowledgeably investing in a project he may be aware is speculative" because, as the brief puts it, "Clearly, freedom includes the notion of making one's own economic decisions."

Like the chain distributor scheme which it is invoked to legitimize, the concept is breathtakingly imaginative. However, we do not find anywhere in the United States Constitution or the case cited [16] an authority for denying to the state the right to prohibit "unfair methods of competition" or "unfair trade practices." The right of the sheep to be sheared at a roulette wheel or in a chain distributor scheme is not constitutionally placed beyond the reach of legislative action and administrative regulations based thereon.

Nor can the proposition that a con man has a constitutional right to defraud the public so long as he reveals the details of his scheme to the victim be based on the claim that the First Amendment right of freedom of speech is invaded by regulating or prohibiting unfair trade practices or false and misleading advertising of a product or economic opportunity. The United States Supreme Court has held that the constitutional protection afforded free speech does not apply to com-

[16] *Griswold v. Connecticut* (1965), 381 U. S. 479, 85 Sup. Ct. 1678, 14 L. Ed 2d 510.

mercial advertising,[17] and we find entirely and obviously correct the federal appeals court holding that the nonapplicability extends to the promoting of products.[18] The role of the "spieler" in inducing prospective purchasers to invest their money is not to be underestimated. Whether the proposition is a chance in a carnival shell game or buying a piece of real estate or a share of stock in a legitimate business enterprise, the selling of it involves speaking or writing, almost always. However, the right to regulate or prohibit derives from the nature of the undertaking, what is being done or attempted, not what is said in explaining or selling it. In the record in this case is the script of a sales pitch presentation, termed an "Opportunity Meeting," designed to induce persons to participate in both the legal and now illegal aspects of plaintiff-appellant's marketing and distributor setup. The company-provided script sternly admonishes that "There will be positively no 'ad-libbing' or deviation from this script." Speaking is involved, but the right to prohibit as an unfair trade practice the chain distributor scheme derives from what is being peddled and how it is being peddled. The right to regulate or prohibit derives from the unfairness of what is done and the scheme is not saved by the sales pitch that accompanies it.

*By the Court.*—Judgment affirmed.

[17] *Valentine v. Chrestensen* (1942), 316 U. S. 52, 54, 62 Sup. Ct. 920, 86 L. Ed. 1262.

[18] *Banzhaf v. Federal Communications Comm.* (D. C. Cir. 1968), 405 Fed. 2d 1082, 1101, 1102, holding: ". . . Promoting the sale of a product is not ordinarily associated with any of the interests the First Amendment seeks to protect. . . . It is rather a form of merchandising subject to limitation for public purposes like other business practices. . . ."