H. EDWIN YOUNG, President, University of Wisconsin System
In your letter of September 16, 1977. You asked me to review my May 19, 1977, informal response concerning the Board of Regents responsibilities under sec. 36.29 (1), Stats. Specifically, you requested my opinion on the constitutionality of this section in light of questions about burden on interstate commerce and interference with foreign relations raised by Professor Gordon B. Baldwin.
The relevant language of sec. 36.29 (1), Stats., dealing with gift and grant money invested by the Board of Regents, provides that:
 ". . . No such investment shall knowingly be made in any company, corporation, subsidiary or affiliate which practices or condones through its actions discrimination on the basis of race, religion, color, creed or sex. . . ."
Thorough analysis of the interstate commerce and foreign relations questions necessitates an inquiry into the proper scope of authority of the federal government and the State of Wisconsin as two distinct sovereignties. Insofar as the subject matter of the statute touches legitimate interests both of the nation and of the state, the task of those called upon to construe the statute is "that of harmonizing such interests without sacrificing either." Union Brokerage Co. v. Jensen, 322 U.S. 202,64 S.Ct. 967 (1944). This sentiment was aptly expressed by the federal District Court of Washington in U.S. v. AhtanumIrrigation Dist., 124 F. Supp. 818 (E.D. Wash. S.D. 1954):
 "The division of powers between the central government and the states is fundamental and is firmly established by the Constitution . . . . [I]t is essential to preserve the balance of local and central governments thus established. It is as much the duty of this Court to preserve states rights as to [confirm the necessary authority of the federal government]." U.S. v. Ahtanum Irrigation Dist., supra, at p. 824.
Section 36.29 (1), Stats., establishing a "no discrimination" standard which the University of Wisconsin Board of Regents investments are to meet, represents an exercise of state authority over *Page 22 
matters of legitimate — indeed compelling — concern to this state. Its provisions reflect a legislative determination that certain state monies are not to be invested in companies which "practice or condone discrimination" and are an emphatic embodiment of the public policy of the State of Wisconsin against unlawful discrimination on the basis of race, religion, color, creed or sex.
The states' authority to regulate their own important governmental activities (National League of Cities v. Usery,426 U.S. 833, 96 S.Ct. 2465 (1976) and to fix their own public policy as to intra-state matters (81 A C.J.S. States sec. 25 (1977)) is clear. It has been suggested, however, that sec. 36.29 (1) impermissibly intrudes upon the federal domain and constitutes both an unconstitutional burden on interstate commerce and an unconstitutional interference with foreign relations.
Interstate Commerce
It has been established beyond question that "the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States . . . ." Freeman v. Hewit, 329 U.S. 249,252, 67 S.Ct. 274 (1946), as cited in Great Atlantic Pac.Tea Co., Inc. v. Cottrell, 424 U.S. 366 (1976).
But, as the Supreme Court pointed out in Great Atlantic Pac.Tea Co., Inc. v. Cottrell, supra, at p. 371:
 "It is no less true, of course, that under our constitutional scheme the States retain `broad power' to legislate protection for their citizens in matters of local concern . . . H. P. Hood Sons, Inc. v. Du Mond, 336 U.S. 525, 531-532, 69 S.Ct. 657, 661-662, 93 L.Ed. 865
(1949), and that not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States. Freeman v. Hewit, supra, 329 U.S., at 253, 67 S.Ct. at 277; Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 351-352, 59 S.Ct. 528, 530-531, 83 L.Ed. 752 (1939)."
Where state legislation arguably touches the federal interest in maintaining the free flow of interstate commerce, the rule laid down in Pike v. Bruce Church, Inc., 397 U.S. 137, 142
(1970), is the *Page 23 
proper gauge by which the constitutionality of the regulation is to be measured:
 "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."
The legitimacy of the state's interest in determining how state finances are to be managed and in setting public policy on an issue which concerns the general welfare, fundamental rights, and individual dignity of its citizens is beyond argument. (cf. secs. 66.432, 101.22, 111.31, et seq., for further legislative expressions of this "no discrimination" policy.)
Just what is the "burden" on interstate commerce resulting from the application of sec. 36.29 (1)? The statute requires the Board of Regents to refrain from purchasing securities in companies which "practice or condone discrimination." Suppose it does so. What percentage of the total dollars in interstate commerce available for investment is controlled by the Regents? What impact would the withholding of those dollars from certain investments have on interstate commerce? I am of the opinion that the potential burden on interstate commerce is so slight and the effect so speculative that it cannot be said to be "clearly excessive" in relation to the local interests involved, and must be considered only "indirect and incidental." I note also that the underlying state policy expressed in sec. 36.29 (1) is entirely consistent with national policy against discrimination in employment and public accommodations. Heart of Atlanta Motel,Inc. v. U.S., 379 U.S. 241 (1964); Katzenbach v. McClung,379 U.S. 294 (1964); Griggs v. Duke Power Co., 401 U.S. 424 (1971). The first two cases cited above relied on testimony that racial discrimination in public accommodations and restaurants "imposed an artificial restriction on the market and interfered with the flow of merchandise." The court in Katzenbach, (supra, at 298), *Page 24 
held that discrimination on the basis of race in access to public accommodations unconstitutionally obstructed interstate commerce.
My conclusion is further supported by the principle of statutory construction that an act is to be given a construction that will avoid constitutional objections to its validity if it will bear such construction. (See cases, Callaghan's Wisconsin Digest sec. 182, Statutes, pp. 188-189 (pocket part).) Whether specific future applications of the "no discrimination" clause will in fact produce sufficient extraterritorial effects to outweigh the local benefits is a question which cannot be answered in the abstract. No such application has been suggested.
Foreign Relations
Federal supremacy in the international arena is undisputed. Exclusive control over the carrying on of foreign relations and the setting of foreign policy has been explicitly vested in the federal government by the Constitution's Supremacy Clause (art. VI, cl. 2). As the Supreme Court in U.S. v. Pink, 315 U.S. 203
(1942), emphatically declared:
 "No State can write our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively."
However, merely raising the spectre of possible interference with foreign relations is insufficient of itself to justify striking down otherwise valid state legislation. The "essential role of the states in our federal system of government" (Usery,supra, p. 2470) compels a thorough analysis of the issue.
Section 36.29 (1) has nothing to do with setting the nation's foreign policy with respect to countries that officially practice or condone discrimination. Indeed, it would be naive, even quixotic, to suppose that sec. 36.29 (1) would have a direct impact on domestic policies of countries such as South Africa. The Legislature's attention was obviously focused on legitimate, internal financial and public policy concerns. The policies the statute was intended to affect are those of the State of Wisconsin itself. To this end the statute measures the conduct of corporations in which the Regents might invest, and not the conduct of countries or governments, except in an indirect way. Thus, the question whether sec. 36.29 (1) — otherwise *Page 25 
within the scope of authority of the Legislature — impermissibly interferes with the conduct of foreign relations and unconstitutionally trespasses on the federal domain is relatively easy to answer.
Judicial analysis in cases dealing with this question of state interference in international affairs makes it clear that every state statute that would have some effect on foreign nations is not thereby fatally flawed. Those which would have only "some incidental or indirect effect in foreign countries" do not intrude on federal authority. That fact, clearly established inClark v. Allen, 331 U.S. 503, 517 (1947), was reaffirmed by the Supreme Court in Zschernig v. Miller, 389 U.S. 429, 433 (1968), the key case in this area:
 "State courts, of course must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, albeit there is a remote possibility, that any holding may disturb a foreign nation — whether the matter involves commercial cases, tort cases, or some other type of controversy."
In Zschernig the Supreme Court was faced with the question of the constitutionality of an Oregon probate statute as applied by the Oregon courts to forbid the transfer of an inheritance to an East German citizen. The statute provided for escheat in cases of inheritance by nonresident aliens unless the person could show that a reciprocal right of U.S. citizens to inherit property on the same terms as citizens of the foreign country existed, and that the person taking the property would in fact have the use or benefit of it. The Court noted that application of the statute involved more than the "routine reading of foreign laws" upheld in Clark v. Allen and objected to the fact that in enforcing the provisions of the statute probate courts "launched inquiries into the type of governments that obtain in particular foreign nations." For these reasons the Court held that the Oregon statute as applied affected international relations "in a persistent and subtle way" and was therefore an unconstitutional encroachment on federal authority over foreign affairs.
The issue here as stated in Zschernig is whether sec. 36.29 (1) involves no more than a "routine reading of foreign laws" with only an "incidental or indirect effect" on the foreign country as opposed to a "persistent and subtle" effect on international relations. The *Page 26 
answer seems obvious. The statute tests the conduct of companies, corporations, subsidiaries, or affiliates. It does not apply to the conduct of governments directly. The issue under the statute is the conduct of the company in which the Regents propose to invest. In the case of companies doing business in South Africa, governmental policy in South Africa is merely one item of evidence in determining corporate conduct and the inquiry into South African policy need go no further than a "routine reading" of South African law. Clark v. Allen, supra.
Cases since 1968 in which Zschernig has been interpreted are enlightening. Typical of these cases is Shames v. State ofNebraska, 323 F. Supp. 1321 (D. Neb. 1971), which involved an action to enjoin the enforcement of a Nebraska statute providing that no nonresident alien could inherit land more than three miles from the corporate limits of any city or town. The District Court in upholding the statute declared:
 "It is thus apparent that every court which has considered Zschernig, has interpreted it to mean that judicial criticism of foreign governments is constitutionally impermissible, and the decision extends no further than that, at the present time.
 "A careful reading of the entire Zschernig opinion and cases decided pursuant to that decision as cited herein, convinces this panel that the sole basis for striking down the Oregon escheat statute was the manner in which the said statute was being applied. Also, it is apparent that every court which has considered Zschernig
has interpreted it to mean no more than judicial criticism of foreign governments is constitutionally impermissible. It is obvious to this Court that the Nebraska statutes challenged herein, are not being applied by the Nebraska Courts in such a way as to come within the prohibitions of the Zschernig case." Shames v. State of Nebraska, supra, p. 1332.
The court in Goldstein v. Cox, 299 F. Supp. 1389 (S.D.N.Y. 1968), reached a similar conclusion:
 "We conclude that this record is inadequate to justify this court in holding, summarily, that Section 2218 is unconstitutional under the Zschernig rule. Without any evidence whatever as to how Section 2218 has been applied in *Page 27 
such a way as to interfere with the foreign relations of the United States. We interpret the Supreme Court's recent ruling denying a rehearing in Ioannou as at least an indication that evidence of improper application of the statute is necessary." Goldstein, supra, at pp. 1393-4.
This uniform reluctance to strike down state legislation under a supremacy clause attack without evidence of its operation and effects has a solid foundation in the Supreme Court's own refusal in Zschernig to overrule Clark v. Allen. Furthermore, Zschernig's
emphasis on the actual effect of state legislation on foreign relations is an indication that the Court may be moving "toward an approach to these problems similar to the one used under the commerce clause, which does consider the strength of the state interest involved." 82:63 Harv. L. Rev. 238-245 (1968).
Two cases decided by state courts illustrate the analysis. InBethlehem Steel Corporation v. Board of Com'rs of Dept. of W. P., 80 Cal. Rptr. 800 (1969), the California court of appeals struck down a California "Buy American" statute containing a requirement that only material manufactured in the United States could be used in the construction of public works or supplied for public use. Recently the New Jersey Supreme Court sustained a similar New Jersey statute where the court was able to find that the law in question did not require local units of government to engage in evaluating politics of foreign governments and did not have a significant and direct impact on foreign affairs. K.S.B.Technical Sales Corp. v. North Jersey District Water SupplyCommission of New Jersey, 46 L.W. 2359 (1977). Although the results appear to be in conflict, the New Jersey court's analysis which looks to actual effect of the statute would appear to be the emerging trend of the law.
In conclusion, based on the Supreme Court's treatment of the Oregon statute in Zschernig and on the careful line it drew between the statute on its face and the statute as applied — a line closely followed by lower courts in subsequent cases, and further supported by Usery's emphasis on states' ability to function effectively in a federal system, it is my opinion that sec. 36.29 (1) on its face does not unconstitutionally intrude on the authority over foreign affairs vested exclusively in the federal government. Furthermore, since application of this statute will involve no more than "routine reading of foreign laws" as one indicium of the conduct of corporations and need not *Page 28 
entail the judicial criticism of foreign governments held constitutionally impermissible in Zschernig, it is also my opinion that sec. 36.29 (1) will not be considered unconstitutional in its operation and effect.
In addition to the foreign relations objections founded on the supremacy clause, it has also been argued that sec. 36.29 (1) involves an unconstitutional interference with foreign relations by running afoul of the "Act of State" doctrine. [The meaning of "act of state" has been understood to include "not only an executive or administrative exercise of sovereign power by an independent state, or by its duly authorized agents or officers, but also legislative and administrative acts such as a statute, decree, or order." Michael Zander, The Act of State Doctrine, 53 Am. J. of Int'l Law 826 (1959)] There are several problems with such a contention. First, the "Act of State" doctrine, while theoretically applicable to state Legislatures and their agencies has traditionally been applied to the courts:
 "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." Underhill v. Hernandez, 168 U.S. 250, 252, as cited in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416
(1964).
The Supreme Court's recent reassessment of the doctrine inAlfred Dunhill of London v. Republic of Cuba, 425 U.S. 682,96 S. Ct. 1854 (1976), echoes this view:
 "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations."
Obviously, the doctrine cannot be used to insulate an individual from all consequences which flow from his choice to reside in a particular country. Allowing the doctrine to be applied to situations involving other than court adjudications would necessarily result in a disquieting extension of the doctrine at a time when the trend has *Page 29 
been increasingly away from sovereign immunity defenses (cf.Dunhill, supra, at 1867-1871).
Secondly, it should also be noted as a matter of fact that the "no discrimination" clause in sec. 36.29 (1) is not at all concerned with the "legality of acts of foreign states on their own soil" but rather with the criteria by which the legality of investments made in Wisconsin is to be determined.
Even assuming the appropriateness of the application of the "Act of State" doctrine in this context, it is my opinion that any conclusion on whether sec. 36.29 (1) actually violates the doctrine must be withheld until a determination on the effects of the statute as applied in a particular case can be made. Logically, a finding that the statute involved only a routine reading of foreign laws and had only an incidental effect in the foreign country forecloses any claim under this doctrine.
Vagueness
One further issue raised by Professor Baldwin remains. Questions have been raised concerning the vagueness of the language of sec. 36.29 (1). Admittedly the phrase "practices or condones through its action discrimination on the basis of race, religion, color, creed or sex" contains terms that must be given concrete meaning. I am of the opinion that the Board in interpreting the statute should read it in pari materia with other state laws concerning discrimination. See sees. 66.432, 101.22, 111.31, et seq., Stats. I believe it to have been the legislative intent to prohibit investment in firms which practice or condone discrimination on the basis of race, religion, color, creed or sex as these terms have been used and construed in parallel statutes, regardless of where that discrimination occurs. While as a practical matter this may create certain real problems for the Board of Regents in formulating administrative guidelines, given the Legislature's assumed awareness of the extensive content provided such terms in cases interpreting other "no discrimination" statutes, it cannot be said that this lack of precision reaches constitutional proportions despite the practical difficulties which may be encountered. The test of vagueness with respect to noncriminal statutes is whether the statute is so vague or uncertain that it is impossible to execute it or ascertain legislative intent with reasonable certainty. HMDistributors of Milwaukee v. Dept. Agri., 55 Wis.2d 261, 271, *Page 30 198 N.W.2d 598 (1972); Forest Home Dodge, Inc. v. Karns, 29 Wis.2d 78,94, 138 N.W.2d 214 (1965).
Construction in Favor of Validity
In closing, one final point should be made. The members of the Board of Regents are public officers vested with considerable discretionary power. As discretionary officers who have taken an oath to uphold the Constitution (sec. 15.07 (7), Stats.), they have many powers and duties which may place them "in the category of a public officer who is permitted to question the constitutionality of an ordinance or statute." State ex rel.Sullivan v. Boos, 23 Wis.2d 98, 100, 126 N.W.2d 579 (1963); see also Fulton Foundation v. Dept. of Taxation, 13 Wis.2d 1,108 N.W.2d 312 (1960).
Nevertheless, it cannot be forgotten that "[t]he validity of a statute must be sustained unless it palpably contravenes a provision of the state or federal constitutions." David JeffreyCo. v. Milwaukee, 267 Wis. 559, 576, 66 N.W.2d 362 (1954). For this reason, "where there are two possible constructions of the law, one under which the law would be violative of the constitution, and another under which it would not be, that construction which would save the law must be adopted." State exrel. La Follette v. Reuter, 36 Wis.2d 96, 120, 153 N.W.2d 49
(1967). See also cases, Callaghan's Wisconsin Digest, supra. For this reason also, "[an] highly unreasonable purpose; [sic] one which would clearly render a legislative enactment void for uncertainty or unconstitutionality, is never to be attributed to the lawmaking power if that can reasonably be avoided." State exrel. McGrael v. Phelps, 144 Wis. 1, 9, 128 N.W. 1041 (1910).
As the preceding analysis of sec. 36.29 (1) makes clear, a legitimate purpose can easily be attributed to the statute, and a construction given which would not render it in violation of the Constitution, either on its face or as applied. Therefore, in my opinion, the Board of Regents is obliged to carry out the duties imposed on it by sec. 36.29 (1) and leave the ultimate determination of the constitutionality of the "no discrimination" clause to the courts.
BCL:DJH *Page 31