# 2020 WI App 7

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2018AP1239

Complete Title of Case:

APPLEGATE-BADER FARM, LLC,

PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

V.

WISCONSIN DEPARTMENT OF REVENUE AND RICHARD CHANDLER
IN HIS CAPACITY AS SECRETARY OF THE DEPARTMENT OF REVENUE,

DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS.

| | |
|---|---|
| Opinion Filed: | January 30, 2020 |
| Oral Argument: | June 26, 2019 |

| | |
|---|---|
| JUDGES:<br>Concurred:<br>Dissented: | Fitzpatrick, P.J., Blanchard and Kloppenburg, JJ. |

Appellant
ATTORNEYS: On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *Anthony D. Russomanno*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Respondent
ATTORNEYS: On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Ryan L. Woody* of *Matthiesen, Wickert & Lehrer, S.C.*, Hartford.

COURT OF APPEALS
DECISION
DATED AND FILED

January 30, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2018AP1239**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV48

**IN COURT OF APPEALS**

APPLEGATE-BADER FARM, LLC,

PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

V.

WISCONSIN DEPARTMENT OF REVENUE AND RICHARD CHANDLER
IN HIS CAPACITY AS SECRETARY OF THE DEPARTMENT OF REVENUE,

DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS.

APPEAL and CROSS-APPEAL from an order of the circuit court for Green County: THOMAS J. VALE, Judge. *Affirmed in part; reversed in part and cause remanded.*

Before Fitzpatrick, P.J., Blanchard, and Kloppenburg, JJ.

¶1 BLANCHARD, J. The appeal in this case involves the interpretation of statutes governing administrative rule making in Wisconsin. The

cross-appeal involves the application of case law addressing the Wisconsin Environmental Protection Act or "WEPA," WIS. STAT. § 1.11 (2017-18).[1] Both issues arise in the context of the challenge of property owner Applegate-Bader Farms, LLC ("the LLC") to amendments to a rule promulgated by the Wisconsin Department of Revenue ("the Department"). The rule is WIS. ADMIN. CODE § Tax 18.05(1)(d) (through Dec. 2019), which defines some of the property uses that qualify as "agricultural use" for property tax classification purposes.[2]

¶2     The circuit court granted the LLC's motion for summary judgment on the grounds that the manner in which the Department promulgated the amended version of § Tax 18.05(1)(d)—after the Department made changes to an initial draft of the rule—failed to comply with three rule-making procedures in WIS. STAT. ch. 227. The court ruled that the Department should have prepared a revised scope statement, held a second public hearing, and prepared a revised economic impact analysis.

¶3     In the appeal, the Department argues that the LLC does not rebut the statutory presumption that the Department's promulgation of the rule amendments complied with the pertinent WIS. STAT. ch. 227 rule-making procedures. We agree with the Department's argument and accordingly we reverse that portion of the circuit court's order.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] We use "§ Tax 18.05(1)(d)" to refer to WIS. ADMIN. CODE § Tax 18.05(1)(d) (through Dec. 2019) as it was amended in 2015. All references to the Administrative Code are to the December 2019 register unless otherwise noted.

¶4 In the cross-appeal, the LLC challenges the separate ruling of the circuit court that rejected an additional reason to invalidate § Tax 18.05(1)(d) as amended, based on WEPA. The LLC argues that the Department violated WEPA by failing to sufficiently investigate the potential environmental effects of amending the rule before deciding not to prepare an environmental impact statement. We conclude that the LLC's challenge to the amendments to § Tax 18.05(1)(d) based on WEPA fails because the LLC alleges only "indirect" environmental effects, which under Wisconsin case law are not alone sufficient to trigger the Department's duty to justify a decision not to prepare an environmental impact statement. Accordingly, we affirm that portion of the court's order.

## BACKGROUND

¶5 We begin by introducing basics regarding pertinent state and federal easement programs and how they relate to WIS. ADMIN. CODE § Tax 18.05(1)(d)-(e) (through June 2015), the predecessor to the rule that the LLC now seeks to invalidate.

¶6 Under certain circumstances, Wisconsin property owners can "enroll" their lands in a variety of state and federal easement programs, which we will generally refer to as "enrolled lands." *See, e.g.*, WIS. STAT. § 23.094 (describing acquisition of easements for state stream bank protection program); 7 C.F.R. § 1468.33 (describing "Enrollment process" for creation of federal Wetland Reserve Easements). Program requirements vary. But generally speaking, owners commit to limit the use of enrolled lands in various ways, in some cases to restore the lands to more natural states. *See, e.g.*, WIS. STAT. § 23.094(3r) ("Restriction on land and easements."); 7 C.F.R. § 1468.30 ("Program requirements" for Wetland Reserve Easement program). And, so far as we can discern, all programs

at least purport to encourage landowners to create and conserve certain types of habitats, such as wetlands, with the goal of achieving environmental or agricultural benefits, or both. *See, e.g.*, 7 C.F.R. § 1468.1(a)(2) (providing that one set of purposes of a federal easement program is "[r]estoring, protecting, and enhancing wetlands on eligible land").

¶7 Wisconsin property tax law contains a set of incentives concerning the easement programs. One incentive is that the owner who enrolls farmland in an easement program may continue to classify that land as having an "agricultural use" for purposes of property taxes, even though the farming activities on the land are limited by the easement program. As explained in more detail below, such an agricultural use classification typically results in a lower tax rate than is applied to land that is not classified as being put to an agricultural use.

¶8 With that basic background, we turn to the contents of WIS. ADMIN CODE § Tax 18.05(1)(d)-(e) (through June 2015) as it existed before the challenged rule-making process to amend the rule, and then to § 18.05(1)(d) as it existed after the process.

¶9 Before amendment, the rule listed specific state and federal easement programs under which enrolled lands in Wisconsin met the definition of "agricultural use" for property tax purposes.[3]

---

[3] To cite one illustrative example, the prior version of the rule defined agricultural use to include all former farmland enrolled in "stream bank protection program" easements under WIS. STAT. § 23.094(3), provided that the land was used as farmland at the time it was enrolled. *See* WIS. ADMIN. CODE § Tax 18.05(1)(e) (through June 2015).

¶10     After amendment, the rule no longer lists specific state and federal easement programs.  Instead, it uses criteria that are not tied to any identified program and that are applied to all easement land to determine if the land meets the definition of agricultural use.  Under the amended rule, for example, land enrolled in any easement program can meet the agricultural use definition if it meets criteria that include the following two standards.  The land was used for farming at the time that it was enrolled into a temporary easement program.  And, the terms of the easement do not restrict the owner from returning the land to farmland following the expiration of the easement.  WIS. ADMIN. CODE § Tax 18.05(1)(d)1., 3.a.

¶11     We now briefly describe aspects of the challenged rule-making process that occurred here.  Consistent with WIS. STAT. § 227.135, the Department prepared a "statement of scope" regarding its proposal to amend WIS. ADMIN. CODE § Tax 18.05(1) as it then existed.[4]   The governor approved this scope statement in July 2013.  *See* 691B Wis. Admin. Reg. (July 31, 2013).   The Department then published an initial draft of the rule, accompanied by a notice of hearing for public comment.  *See* 696B Wis. Admin. Reg. 49-50 (Dec. 31, 2013).  Also included in this publication was a "fiscal estimate and economic impact analysis" of the rule.

---

[4] The scope statement prepared by the Department stated that the objective of the proposed rule was to "amend WIS. ADMIN. CODE § Tax 18.05(1) to provide further clarity regarding what land in federal and state pollution control and soil erosion programs should be classified as agricultural property that qualifies for use-value assessment," by "identify[ing] general criteria for determining what land that is in federal and state pollution control and soil erosion programs qualifies for agricultural use."  691B Wis. Admin. Reg. 16 (Jul. 31, 2013).

¶12   The Department held a hearing to receive public comments on the initial draft of the proposed amendment in January 2014.  It accepted written comments before and after the hearing.

¶13   After the hearing, the Department made substantive changes to the initial draft.  We will distinguish between the two versions by referring to the "initial draft rule" and "the changed draft rule."

¶14   The Department submitted the changed draft rule to the legislature and the governor for final approval.  *See* WIS. STAT. §§ 227.185, 227.19 (describing review by governor and legislature of final draft rule); 710A2 Wis. Admin. Reg. (Feb. 2, 2015).  The submission to the legislature included a report that summarized the public comments that the Department had received and described the changes made from the initial draft rule.  *See* § 227.19(3)(b) (describing report agency must make to legislature, which is to include a "summary of public comments" and the agency's modifications to the rule "as a result of" comments).

¶15   The Department submitted the changed draft rule to the legislature and the governor without taking any of the following steps, which the LLC contends were necessary in light of the changes:  preparing a revised scope statement; holding a second hearing for public comment on the changed draft rule; or preparing a revised economic impact analysis addressing the changed draft rule.

¶16   The governor approved the changed draft rule in January 2015.  The legislature took no action to prevent its promulgation.  *See* WIS. STAT. § 227.19(4)-(5).  The Department filed the changed draft rule with the legislative reference bureau.  *See* WIS. STAT. § 227.20(1); 714B Wis. Admin. Reg. (June 31, 2015) (stating effective date of June 1, 2015, for § Tax 18.05(1)(d)).

¶17 The Department did not prepare an environmental impact statement for either version of the draft rule, as is called for under WEPA under certain circumstances. *See* WIS. STAT. § 1.11(2)(c)1. ("All agencies of the state shall … [i]nclude in every recommendation or report on proposals for … major actions significantly affecting the quality of the human environment, a detailed statement" on "[t]he environmental impact of the proposed action.").

¶18 The LLC commenced this action in April 2016. It sought to have § Tax 18.05(1)(d) as amended declared invalid based on nine grounds, two of which are pertinent to this appeal. First, the Department did not properly follow WIS. STAT. ch. 227 procedures because it did not undertake the additional rule-making steps of revising the scope statement, holding another public comment hearing, or revising the economic impact analysis after making changes to the initial draft rule. Second, the Department violated WEPA because it did not sufficiently investigate potential environmental effects of the rule before deciding not to prepare an environmental impact statement.

¶19 Following cross motions for summary judgment, the circuit court determined that the Department failed to comply with proper rule-making procedures under WIS. STAT. ch. 227. This determination alone justified summary judgment in the LLC's favor, and would result in invalidation of the rule. However, the court took the additional step of determining that the Department's failure to produce an environmental impact statement had not violated WEPA. Based on the ch. 227 rulings, the court granted the LLC's summary judgment motion and denied the Department's summary judgment motion.

¶20 As a remedy, the circuit court invalidated § Tax 18.05(1)(d). *See* WIS. STAT. § 227.40(4)(a) ("the court shall declare the rule … invalid if it finds

that [the rule] … was promulgated … without compliance with statutory rule-making … procedures.").  The court granted the Department's motion for a stay of its invalidation of the rule pending resolution of this appeal.

¶21     The Department appeals the WIS. STAT. ch. 227 rulings and the LLC cross-appeals the WEPA ruling of the circuit court.

## DISCUSSION

¶22     We begin with the Department's appeal, then address the LLC's cross-appeal.

¶23     We review the circuit court's decision to grant summary judgment de novo.  *See Olson v. Town of Cottage Grove*, 2008 WI 51, ¶¶33-34, 309 Wis. 2d 365, 749 N.W.2d 211.  "A party is entitled to summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Id.*, ¶34; WIS. STAT. § 802.08(2).  We address additional legal standards where pertinent below.

## I.  Chapter 227 Procedures

¶24     Before addressing all WIS. STAT. ch. 227 issues raised by the LLC, we provide additional legal standards, background regarding property tax assessments, and pertinent details regarding the Department's changes to the draft rule.

¶25     Whether the Department promulgated § Tax 18.05(1)(d) in compliance with statutory rule-making procedures presents a question of law that we review de novo.  *See Wisconsin Realtors Ass'n v. PSC*, 2015 WI 63, ¶39, 363 Wis. 2d 430, 867 N.W.2d 364.

¶26    Notably, we bear in mind the presumption that the Department complied with all WIS. STAT. ch. 227 rule-making procedures because the Department filed the final version of the rule with the legislature at the end of a rule-making process. *See* WIS. STAT. § 227.20(3)(c) ("Filing a certified copy of a rule with the legislative reference bureau creates a presumption … [t]hat all of the rule-making procedures required by this chapter were complied with …."). Therefore, as the LLC acknowledges, it bears the burden of rebutting this presumption. *See **Wisconsin Realtors***, 363 Wis. 2d 430, ¶66.

¶27    We now fill in pertinent details on the property tax aspect of the rule making at issue here. Property taxes in Wisconsin are assessed based in part on how the owner uses the land. *See* WIS. STAT. § 70.32(2)(a); *see also **Sausen v. Town of Black Creek Bd. of Review***, 2014 WI 9, ¶¶15-17, 352 Wis. 2d 576, 843 N.W.2d 39 (describing multi-step property tax assessment process). Most property use classifications are taxed according to the land's market value. *See* § 70.32(1). However, land with an "undeveloped" use classification is taxed at 50% of the market value. *See* § 70.32(4); *see also* § 70.32(2)(c)4. (defining undeveloped land to include "bog, marsh, lowland brush, uncultivated land zoned as shoreland … and shown as a wetland on a final map under s. 23.32 or other nonproductive lands not otherwise classified."). And, land with an "agricultural land" use classification is taxed according "to the income that could be generated from its rental for agricultural use." Sec. 70.32(2r). This agricultural "use-value" taxation is generally lower than a tax based on the market value of the same land.[5]

---

[5] To illustrate this disparity, the Department's economic impact analysis for the rule stated that, in the 2012-13 property tax year, the average taxable value for "undeveloped" land statewide was $636 per acre, while the average for "agricultural" land was $177.

9

As pertinent here, "'agricultural land' means land that is devoted primarily to agricultural use," § 70.32(2)(c)1g., and "agricultural use" is "defined by the department of revenue by rule," § 70.32(2)(c)1i.

¶28    Both before and after the challenged amendments here, § Tax 18.05(1) has provided a definition of "Agricultural use." At all pertinent times, the portions of § Tax 18.05(1) not dealing with easement programs have defined as "agricultural uses" the activities of "Crop Production," "Animal Production," and the growth of "Christmas trees or ginseng." *See* § Tax 18.05(1)(a)-(c); ***State ex rel. The Peter Ogden Family Trust of 2008 v. Board of Review***, 2019 WI 23, ¶¶28-32, 385 Wis. 2d 676, 923 N.W.2d 837. We will sometimes refer to these defined agricultural uses as the "specified agricultural uses."

¶29    With that background, the Department initiated the rule-making process to amend the portion of § Tax 18.05 that determines which easement programs, in addition to the specified agricultural uses, qualify for the "agricultural use" definition. Thus, the rule-making process here effectively addressed how the Department would divide the assessment of all land enrolled in easement programs into one of two classifications: the higher-taxed "undeveloped use" or the lower-taxed "agricultural use."

¶30    To repeat and summarize, before the Department promulgated the amendments to § Tax 18.05(1)(d), the pre-existing version of the rule listed all of the specific state and federal easement programs under which enrolled land qualified for the "agricultural use" definition. *See* WIS. ADMIN. CODE § Tax 18.05(1)(d)-(e) (through June 2015). This list did not include what we will refer to

as "the LLC's federal easement program," into which the LLC had enrolled approximately 1,900 acres of its property.[6] *See id.*

¶31 The initial draft rule would have addressed the determination of whether enrolled land qualifies as "agricultural land" in the following manner. The list of specified easement programs would have been replaced by three criteria defining the pertinent "agricultural use." All lands in federal and state easement programs would be assessed under the following three criteria: (1) the land was being used in one of the specified agricultural uses (*e.g.*, crop production) when it was enrolled into the easement program; (2) the easement meets specified standards set by the Department of Agriculture, Trade, and Consumer Protection ("DATCP"); and (3), for temporary easements, the landowner must be allowed, if the landowner wants, to return the land to one of the specified agricultural uses after the easement expires. *See* 696B Wis. Admin. Reg.[7]

---

[6] In this opinion, "the LLC's federal easement program" collectively refers to the Wetland Reserve Program (which ceased enrolling new land in 2014) and to part of a currently active program that is in part the Wetland Reserve Program's successor. Easements created under the Wetland Reserve Program and its successor are administered by the same federal agency. *See* 16 U.S.C. § 3865c(b)(1)(B); 7 C.F.R. Part 1467.

[7] In pertinent part, the initial draft rule defined "agricultural use" in the following manner:

> (d) Commencing with the January 1, 2015 assessment, land without improvements subject to a temporary federal or state easement or enrolled in a temporary federal or state program if that land was in agricultural use under par. (a), (b), or (c) when it was entered into the easement or program, and that the terms of the easement or program do not restrict the return of the land to agricultural use under par. (a), (b), or (c) after the easement or program is satisfactorily completed. Qualifying easements and programs shall adhere to standards and practices provided under the July 2011 No. 667 version of s. ATCP 50.04, 50.06, 50.72, 50.83, 50.88, or 50.98.…

(continued)

¶32 It is undisputed that, under the initial draft rule, the LLC's federal easement program land would have been included in the definition of "agricultural use" and therefore would have been part of the lower taxed agricultural land classification.

¶33 The most pertinent of the changes the Department made to the draft rule following public comments added, beyond the three criteria in the initial draft rule, a further requirement for permanent easements in order to be included in the "agricultural use" definition.[8] Specifically, under the changed draft rule, the

---

> (e) Commencing with the January 1, 2015 assessment, land without improvements subject to a permanent federal or state easement or enrolled in a permanent federal or state program if that land was in agricultural use under par. (a), (b), or (c) when it was entered into the easement or program. Qualifying easements and programs shall adhere to standards and practices provided under the July 2011 No. 667 version of s. ATCP 50.04, 50.06, 50.72, 50.83, 50.88, or 50.98.

696B Wis. Admin. Reg. (Dec. 31, 2013).

[8] The final version of the rule, eventually promulgated as § Tax 18.05(1)(d), included the following to define "agricultural use," with the largest substantive change from the initial draft rule being the addition of language in subpart "3.b.":

> (d) Land without improvements subject to a federal or state easement or enrolled in a federal or state program if all of the following apply:
>
> 1. The land was in agricultural use under par. (a), (b), or (c) when it was entered into the qualifying easement or program, and
>
> 2. Qualifying easements and programs shall adhere to standards and practices provided under the January 31, 2014 No. 697 version of s. ATCP 50.04, 50.06, 50.71, 50.72, 50.83, 50.88, 50.91, 50.96, or 50.98 …, and

(continued)

owner of land enrolled in a permanent easement is required to have obtained authorization, during the previous year, from the administrator of the easement program to use the land for an activity that is one of the specified agricultural uses. Sec. Tax 18.05(1)(d)3.b. These previous-year authorized uses are sometimes referred to as "compatible uses," apparently based on the idea that some agricultural activities might be compatible with the conservation purposes of the easement at issue. *See, e.g.*, 16 U.S.C. § 3865c(b)(5)(C)(i) ("Land subject to a wetland reserve easement may be used for compatible economic uses, including such activities as … periodic haying or grazing, if such use is specifically permitted by the wetland reserve easement plan developed for the land … and is consistent with the long-term protection and enhancement of the wetland resources for which the easement was established.").[9]

---

**3.**

> **a.** The terms of the temporary easement or program do not restrict the return of the land to agricultural use under par. (a), (b), or (c) after the easement or program is satisfactorily completed, or

> **b.** The terms of an easement, contract, compatible use agreement, or conservation plan for that specific parcel authorized an agricultural use, as defined in par. (a), (b), or (c), for that parcel in the prior year.

*See* WIS. ADMIN. CODE § Tax 18.05(1)(d).

[9] While on the compatible use topic, we note that the LLC devotes considerable energy to an argument based on what it characterizes as a "sham compatible use authorization scheme" by the Department and DATCP to unfairly advantage state-administered permanent easements over federally administered permanent easements. However, we conclude that this argument is not well developed, even if it were pertinent to our analysis.

The LLC notes that the circuit court found that, after promulgating § Tax 18.05(1), DATCP granted authorizations for compatible uses for all of the permanent easements that are under its administration for all years going forward. The LLC further notes that, as reflected in

(continued)

13

¶34    Before addressing in turn each of the rule-making procedures that the LLC contends the Department should have undertaken, we briefly explain why we reject the LLC's argument that Department representatives engaged in improper communications with interested parties.[10]

### A. *Pre-Scope Statement Activity*

¶35    In addition to its other challenges under Chapter 227, the LLC for the first time on appeal and in a cursory fashion makes an additional argument in support of affirming the circuit court.   The LLC argues that Department representatives "met and communicated" multiple times with interested parties regarding the proposed rule before the scope statement was approved, in violation of WIS. STAT. § 227.135(2) (state employees and officials are generally prohibited

---

the Wisconsin Property Assessment Manual, the Department interprets § Tax 18.05(1)(d)3.b. to require only that a compatible use (*e.g.*, grazing) be authorized by the easement administrator, even if the landowner is not actually engaged in the authorized use on the enrolled land.  The effect, according to the LLC, is that, under the adopted final rule, permanent DATCP-administered easements will always qualify for agricultural use classification, while permanent easements in the LLC's federal easement program never will.

Problems with this argument include the following.  The LLC does not address the ability of federal easement administrators also to issue "blanket" compatible use authorizations.   In addition, the LLC does not address how its bias allegation can be squared with the fact that, as the LLC itself notes, under § Tax 18.05(1)(d) some of the state-administered easements are left in the same disadvantaged position as the LLC's federal program.  Further, we question whether the LLC presented to the circuit court sufficient evidentiary support to justify summary judgment based on this scheme allegation under any legal theory.  Beyond all that, the LLC fails to make clear how the alleged scheme should inform our analysis of whether the Department followed proper rule-making procedures.

[10] We note that the Department does not dispute the LLC's argument that it has standing to contest the validity of § Tax 18.05(1)(d), because there is no dispute that the rule has the effect of increasing the LLC's tax burden on acreage it has enrolled in the federal easement program. We note that the parties do contest whether the LLC has standing to bring its WEPA claim, but we do not address these arguments because we resolve that issue against the LLC based on reasoning explained below.

from "perform[ing] any activity in connection with the drafting of a proposed rule" before scope statement is approved, aside from activity necessary to prepare the scope statement).

¶36 As the Department notes, WIS. STAT. § 227.135(2) and related statutes do not flatly prohibit all agency activity before an agency issues a scope statement. Logically, § 227.135(2) explicitly allows the agency to undertake all activity necessary to prepare the scope statement. Further, under WIS. STAT. § 227.13, "[a]n agency may use informal conferences and consultations to obtain the viewpoint and advice of interested persons with respect to contemplated rule making." The LLC does not attempt to reconcile §§ 227.135(2) and 227.13, so as to create a coherent standard, and therefore does not make clear what types of communications or meetings it submits are prohibited by § 227.135(2). The LLC compounds this problem by merely referencing communications that allegedly occurred here without addressing the content of any referenced communication. The effect is that, regardless of the precise meanings of §§ 227.135(2) and 227.13, the LLC completely fails to identify improper communications that involved rule drafting, as opposed to proper communications that involved scope statement preparation. Put in summary judgment terms, the LLC fails to show that there is no genuine issue of material fact on this issue under the correct legal standard.

*B. Revised Scope Statement*

¶37 We now address the issue of when an agency making a rule needs to revise a previously authorized scope statement.[11] The LLC argues that the

---

[11] Summarizing the basics on scope statements, an agency seeking to promulgate a rule must prepare "a statement of the scope of any rule that it plans to promulgate." WIS. STAT.

(continued)

15

Department was required to prepare a revised scope statement because its changes to the draft rule were "meaningful or measurable" changes to "the scope of the proposed rule" as those phrases are used in WIS. STAT. § 227.135(4). The argument is essentially that a draft rule is equivalent to "the scope of the proposed rule" and therefore each time there is a "meaningful or measurable" change to a draft rule this is a "meaningful or measurable" change to "the scope of the proposed rule." Under the LLC's definition, because the changed draft rule here was a "meaningful or measurable' change from the initial draft rule, the changed draft rule was a "meaningful or measurable" diversion outside the scope of the initial draft rule and therefore a revised scope statement was needed.

¶38 The Department argues that the previously authorized scope statement is "the scope of the proposed rule" referenced in WIS. STAT. § 227.135(4). Under this view, there is a change to "the scope of the proposed rule" only when the agency changes a draft rule under consideration in a way that "meaningfully or measurably" departs from the topics described in the previously authorized scope statement. Using this definition, the Department argues that there was no need for a revised scope statement here because all of the topics covered in both the initial and changed versions of the draft rule fit within the range of topics for potential rules described in the previously authorized scope statement.

---

§ 227.135(1). Scope statements must enumerate identified categories of information regarding the proposed rule, including, for example, "[a] description of all of the entities that may be affected by the rule." Sec. 227.135(1)(e). The agency submits its proposed scope statement to other parts of the executive branch, a process that includes the governor exercising his or her discretion to approve or reject the scope statement. *See* § 227.135(2).

¶39 As we explain more fully below, based on our interpretation of WIS. STAT. § 227.135(4), we agree with the Department. We reject the LLC's argument that an agency must create a revised scope statement whenever a draft version of a rule is changed in a meaningful or measurable way, even if the changed rule fits within the ambit of the previously authorized scope statement. This is because the comparison mandated by § 227.135(4) is not between a changed draft rule and the initial draft rule, but between a changed draft rule and the previously authorized scope statement. The LLC concedes that, if our interpretation is correct, no revised scope statement is required here. And, we note at the outset that the LLC does not argue that the previously authorized scope statement itself violated any provision in § 227.135. Before explaining our conclusion, we provide the pertinent standards for statutory interpretation and then describe pertinent aspects of § 227.135(4).

¶40 "Statutory interpretation presents a question of law that we review de novo." *DOR v. River City Refuse Removal, Inc.*, 2007 WI 27, ¶26, 299 Wis. 2d 561, 729 N.W.2d 396. We give statutory language "its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *See State ex rel. Kalal v. Circuit Ct. for Dane Cty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. Further, we interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *See id.*, ¶46. The "scope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself." *Id.*, ¶48.

¶41　The provision at the heart of this dispute is WIS. STAT. § 227.135(4). It describes when and how an agency must revise a scope statement and seek the governor's approval of the revised statement. Subsection (4) provides in pertinent part as follows, with emphasis on the phrases primarily in dispute:

> If at any time after a *statement of the scope of a proposed rule* is approved under sub. (2) the agency *changes the scope of the proposed rule* in any meaningful or measurable way, including changing the scope of the proposed rule so as to include in the scope any activity, business, material, or product that is not specifically included in the original scope of the proposed rule, the agency shall prepare and obtain approval of a revised statement of the scope of the proposed rule in the same manner as the original statement was prepared and approved ….

Sec. 227.135(4) (emphasis added).

¶42　The parties say that they are not aware of case law that directly interprets this provision. Chapter 227 does not contain a specific definition of the phrase "changes the scope of the proposed rule."

¶43　Before undertaking our analysis, we note that the long single sentence comprising WIS. STAT. § 227.135(4) is not a model of clarity. In particular, when read in isolation, the two phrases "a statement of the scope of a proposed rule" and "changes the scope of the proposed rule" risk confusing two related but distinct topics: scope statements and draft rules. However, as we now explain, the language of § 227.135(4) and closely related statutes, together with the evident intent of the legislature in enacting these statutes, demonstrate that a rule-making agency must revise a scope statement only when the draft rule under consideration meaningfully or measurably varies from the topics described by the scope statement.

¶44 We begin our analysis with a key concept from a closely related statute, WIS. STAT. § 227.01(10). Subsection (10) defines "'[p]roposed rule'" as "all or any part of an agency's proposal to promulgate a rule." This technical definition may be counterintuitive because it is so broad. One might ordinarily think that the phrase "proposed rule" would be limited to the text of a draft rule, in all contexts. However, in this technical definition the legislature tells us that context matters to the meaning of "proposed rule." Notably, when a particular context calls for it, "proposed rule" can mean *all* aspects of the agency's efforts to amend or create a new rule.[12] As we explain further below, the context of WIS. STAT. § 227.135(4) demonstrates that this broad meaning applies here. Based on this, it is obvious from the text and evident intent of § 227.135(4) that the legislature intended to require a "reset" of a rule-making process only when a draft rule meaningfully or measurably strays from the topics identified in the previously authorized scope statement, not merely when there are meaningful or measurable changes to a draft rule.

¶45 Returning to the text of WIS. STAT. § 227.135(4), we identify the meaning of the term "scope." Neither WIS. STAT. § 227.01 nor § 227.135 define "scope." Therefore, we resort to dictionary definitions that appear to be pertinent. "Scope" in § 227.135(4) means the range or extent of the subject involved in the

---

[12] It is true that the WIS. STAT. § 227.01(10) definition contemplates that "proposed rule" can, depending on context, mean merely a "part of an agency's proposal to promulgate a rule," such as the part that is the text of a draft rule. Thus, some provisions of ch. 227 provide that submitting a "proposed rule" for review by various government entities involves providing more than the text of a rule. *See, e.g.*, WIS. STAT. § 227.15(1) (requiring agency to "submit the proposed rule to the legislative council staff for review," further requiring that the "proposed rule … shall include" various analyses such as an economic impact analysis). However, to repeat, § 227.01(10) provides a broader definition of "proposed rule" in some contexts to mean "all" aspects of an agency's proposal to amend or create a rule.

"proposed rule."[13]  We now address the wider context of WIS. STAT. ch. 227 as a whole, which demonstrates that the range or extent of a subject referenced in § 227.135(4) cannot reasonably be read to focus narrowly on any "meaningful or measurable" changes to draft rules.

¶46    The preparation of the scope statement itself is an involved process. This includes, early on in the process of preparing a proposed rule, review of the scope statement by the governor and legislature.[14]  The LLC's rule-draft-to-rule-draft interpretation would unreasonably force agencies to restart the entire rule-making process in some circumstances.  Notably, as we discuss below, this would be required even when changes to a draft rule being considered do not meaningfully or measurably stray from the topics identified in the previously authorized scope statement.  That is, interpreting the "scope of the proposed rule" as a continuous assessment of any "meaningful or measurable" change between one rule draft and the next would lead to the unreasonable result of requiring sometimes unnecessary new scope statements, each requiring a new round of legislative and gubernatorial approval and possibly a separate hearing.  *See* WIS. STAT. § 227.135(4) ("the agency shall … obtain approval of a revised statement of

---

[13] Scope is defined as "[t]he extent of a given … subject that is involved, treated, or relevant," or the "range" of a subject.  *Scope*, AMERICAN HERITAGE DICTIONARY (https://www.ahdictionary.com/word/search.html?q=scope).

[14] *See* WIS. STAT. § 227.135(2)-(3) ("No state employee or official may perform any activity in connection with the drafting of a proposed rule, except for an activity necessary to prepare the statement of the scope of the proposed rule until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve the statement."); WIS. STAT. § 227.136 (within 10 days of the publication of a governor-approved scope statement, legislature may require an agency hold a preliminary public hearing specifically on a scope statement).

the scope of the proposed rule in the same manner as the original statement was prepared and approved under" § 227.135(1)-(2)).

¶47　We say sometimes unnecessary new scope statements, because as the LLC itself notes, "measurable" means "able to be measured" or "large enough to be measured; noticeable."[15]　Under the LLC's interpretation, changing the number of anything in any draft rule—no matter how trivial the countable change and no matter how squarely within the scope statement the new rule would be—would force a "reset" of the rulemaking process.　Thus here, under the LLC's approach, we see no faithful interpretation of "measurable" that would not require a new scope statement for each and every change to drafts of proposed WIS. ADMIN. CODE § Tax 18.05(1) that shifted any measurable amount of easement land from one taxable use classification to another, no matter how few acres were involved.[16]　In comparison to the LLC's approach, a meaningful or measurable departure from the scope statement would not open up the rule-making process to being restarted as frequently, only requiring a new scope statement where the subject matter of the rule-making process changes.　*See, e.g.*, WIS. STAT. § 227.135(4) (providing that adding to the "scope of the proposed rule" "any activity, business, material, or product" is an example of meaningful or measurable change to the scope).

---

[15] *Measurable*, ENGLISH OXFORD LIVING DICTIONARIES (en.oxforddictionaries.com/definition/measurable).

[16] At oral argument, the LLC asserted that its interpretation would not require revised scope statements for any changes to draft rules, only for "meaningful *and* measurable" changes. This plainly misreads WIS. STAT. § 227.135(4), which speaks in the disjunctive:　"meaningful *or* measurable" changes.

¶48   It only undermines the LLC's argument that, under its interpretation of WIS. STAT. § 227.135(4), any meaningful or measurable changes between two rule drafts that fit within the scope statement could apparently compel a rule-making agency to reissue and seek approval for a scope statement that has *no changes* from the previously authorized scope statement.  The LLC does not argue that the content of the previously authorized scope statement in this case needed to be revised because it did not encompass the changed draft rule and we fail to see how it could make any such argument.

¶49   In addition to the wider context of WIS. STAT. ch. 227 as a whole, we look to the specific provisions in WIS. STAT. § 227.135.  It is clear from these terms that it is the previously authorized scope statement that gives content to "the scope of the proposed rule" in subsection (4) and that "the scope of the proposed rule" is not limited to one version of the draft rule.  Several of the elements that must be included in each scope statement, enumerated in § 227.135(1), correspond to the subject matter of the rule-making procedure, which is consistent with the evident purpose of § 227.135(4) that we describe above.[17]  This is illustrated by

---

[17]   Specifically, WIS. STAT. § 227.135(1) requires that each statement of scope contain all of the following:

(a)  A description of the objective of the rule.

(b)  A description of existing policies relevant to the rule and of new policies proposed to be included in the rule and an analysis of policy alternatives.

(c)  The statutory authority for the rule.

(d)  Estimates of the amount of time that state employees will spend to develop the rule and of other resources necessary to develop the rule.

(continued)

the requirements that a scope statement describe "the objective of the rule" and "existing policies relevant to the rule and of new policies proposed to be included in the rule." *See* § 227.135(1)(a)-(b). These requirements are consistent with a range of possible outcomes for the agency's proposal to promulgate a new rule—consistent with the definition above of "scope"—regardless of the content of the particular rule that may survive the process.

¶50    Beyond all that, the absence of language in WIS. STAT. § 227.135(4) regarding draft rules further supports the view that § 227.135(4) addresses changes from topics included in the scope statement. The legislature could have easily phrased § 227.135(4) to require the revision of scope statements whenever there is a change to "the text of the proposed rule," or, following the wording of other statutes in WIS. STAT. ch. 227, whenever there is a change to the "draft" or "form of the proposed rule." *See, e.g.*, WIS. STAT. §§ 227.185 ("After a proposed rule is in *final draft form*, the agency shall submit the proposed rule to the governor for approval." (emphasis added)), 227.14(2) (preparation of proposed rule includes creating an analysis of the plain language of the proposed rule "printed as a preface to the text of the proposed rule when it is published or distributed"). Instead, it chose to use the broader phrase, "changes the *scope*." Put differently, it is difficult to see why the legislature would use the term "scope" to refer to draft rules and not to refer to "statements of the *scope*." *See* § 227.135(1)-(3). To point

---

(e) A description of all of the entities that may be affected by the rule.

(f) A summary and preliminary comparison of any existing or proposed federal regulation that is intended to address the activities to be regulated by the rule.

23

out the obvious, scope statements are descriptions of "the scope of the proposed rule." It is reasonable to determine if there has been "any meaningful or measurable" changes in "the scope of the proposed rule" by comparing the changed draft rule to the statement of scope.

¶51 The LLC contends that the Department's interpretation of WIS. STAT. § 227.135(4) would lead to an absurd result: an agency could easily avoid public resistance to a proposed rule by preparing a broadly framed, seemingly uncontroversial scope statement and offering an initial draft rule designed to have broad appeal but then, after the close of public comment, switch to a controversial changed draft rule that still falls within the topics in the broadly framed scope statement. Indeed, the LLC contends that the Department used such a strategy here.

¶52 However, it is not necessary for us to address the details of the LLC's allegations that the Department intentionally sought to avoid public resistance to the Department's desired outcome. We assume without deciding that the LLC has identified a potential weakness in rule-making procedure that could be exploited in some circumstances. The problem for the LLC is that it does not point to, and we do not discern, a suggestion in the text of WIS. STAT. § 227.135(4) that the legislature intended to use subsection (4), or § 227.135 more generally, to address that potential weakness.

¶53 Moreover, it undermines the LLC's argument that rule-making procedures provide other ways to limit the use of scope statements to avoid public scrutiny of rule making. As noted by the Department, scope statements are reviewed by the governor, who may in his or her discretion decide that a submitted scope statement is too vague or broad or otherwise inappropriate. *See* WIS. STAT.

24

§ 227.135(2). In addition, the legislature has the ability to direct that the agency hold a preliminary public hearing and comment period on a submitted scope statement. WIS. STAT. § 227.136.

¶54 Further, if scope statements are overly broad or otherwise inappropriate, they may fall short of one or more requirements outlined in WIS. STAT. § 227.135(1)(a)-(f), and we see no reason why a rule challenger could not seek to rebut the presumption that a scope statement complied with the requirements. *See* WIS. STAT. § 227.40(2)(e), (4)(a) and WIS. STAT. § 227.52(1). To repeat, although the LLC argues here that the scope statement was deceptively vague, it makes no argument that the scope statement violated § 227.135(1).

¶55 The LLC argues that a 2011 executive order issued by the governor is persuasive authority for the LLC's interpretation of WIS. STAT. § 227.135(4). Specifically, the LLC notes that the executive order lists changes to "[t]he overall breadth or scope of the regulation in the proposed rule" or the "entities affected by the rule" as examples of "meaningful or measurable change." Executive Order No. 50, ¶II.10. (Nov. 2, 2011). The LLC argues that these could be references only to the breadth or scope of a draft rule, or the entities affected by that draft. However, the LLC does not explain why "breadth or scope of the regulation in the proposed rule" or the "entities affected" could not be references to the scope statement's description of that information, consistent with our analysis above of the plain language of pertinent statutes. We note that the executive order elsewhere states that "the agency shall review *the statement of scope* to determine whether *it was changed* in any meaningful or measurable way under WIS. STAT. § 227.135(4)." *Id.*, ¶IV.2. (emphasis added).

25

¶56   In sum on this issue, under our interpretation of WIS. STAT. § 227.135(4), the Department did not violate rule-making procedure by failing to prepare a revised scope statement based on the changes to the draft rule.

### C. Second Public Hearing

¶57   The LLC argues that the Department's changes to the initial draft rule triggered a duty for the Department to hold a hearing for public comment on the changed draft rule. The LLC bases its argument on case law precedent that includes *Brown County v. DHSS*, 103 Wis. 2d 37, 55, 307 N.W.2d 247 (1981) (additional public hearing required where changed draft rule "so far differs from" the initial draft "that the first hearing could not be said to have offered an opportunity for interested parties to influence the final outcome."). The Department counters that any case law proposition that changes from one rule draft to another could require agencies to hold new public hearings has been superseded by changes to WIS. STAT. ch. 227 or abrogated by later case law. The Department argues in the alternative that it was not necessary to hold a second hearing even if precedent such as *Brown County* is binding authority.

¶58   We conclude that *Brown County* remains good law for the proposition that changes to a draft rule may, in some situations, require another hearing for public comment. However, we further conclude that a new public hearing was not required here under this case law. As we will explain, this is because interested parties here were on notice that the Department could promulgate a draft rule resembling the one adopted. That is, in the terms of *Brown County*, the changes to the draft rule were "the legitimate implementation of the input" received at the hearing for public comment. *See Brown Cty.*, 103 Wis. 2d at 55. We begin our analysis by discussing the pertinent statutory

requirements regarding hearings for public comment and ***Brown County*** in more depth.[18]

¶59    "[A]ll rule making by an agency shall be preceded by notice and public hearing."  WIS. STAT. § 227.16(1).  As part of legislative review of a final draft rule prior to promulgation, a rule-making agency must prepare a report for the legislature that includes, among other things, "[a] summary of public comments to the proposed rule and the agency's response to those comments, and an explanation of any modification made in the proposed rule as a result of public comments or testimony received at a public hearing."  *See* WIS. STAT. § 227.19(3)(b).  This report must also list "the persons who appeared or registered for or against the proposed rule at a public hearing."  Sec. 227.19(3)(c).

---

[18] We now explain why we reject the Department's apparent argument that legislative changes to WIS. STAT. ch. 227 and more recent case law render ***Brown County*** no longer good law on the new hearing topic.  The Department contends that changes to ch. 227 since ***Brown County***—including an increase in overall comprehensiveness and the creation of new statutes dealing with what happens after public hearings—effectively superseded the pertinent portion of that case.  *See, e.g.*, 1985 Wis. Act 182, § 42 (creating WIS. STAT. § 227.18-21); ***Brown Cty. v. DHSS***, 103 Wis. 2d 37, 41, 307 N.W.2d 247 (1981) (operating under earlier version of ch. 227 to rule promulgated in 1978).  The Department further advances an expansive interpretation of a statement of our supreme court to the effect that the court has abrogated or withdrawn language in ***Brown County***.  *See **Wisconsin Realtors Ass'n v. PSC***, 2015 WI 63, ¶89, 363 Wis. 2d 430, 867 N.W.2d 364.  Specifically, in ***Wisconsin Realtors***, the court "decline[d] to read a procedural requirement into [WIS. STAT. ch. 227] that the legislature opted not to impose."  ***Id.***

The Department has at most identified trends in the law that may one day cause our supreme court to decide to abrogate or overrule statements in ***Brown County***.  The Department fails to identify a clear signal that ***Brown County***'s discussion of post-rule-change public hearings is no longer good law.  *See **Cook v. Cook***, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (Court of appeals may not overrule, modify or withdraw language from a supreme court decision); ***Augsburger v. Homestead Mut. Ins. Co.***, 2014 WI 133, ¶40, 359 Wis. 2d 385, 856 N.W.2d 874 ("legislation in derogation of the common law should be strictly construed so as to have minimal effect on the common law rule"); ***Strenke v. Hogner***, 2005 WI 25, ¶28, 279 Wis. 2d 52, 694 N.W.2d 296 ("The legislature is presumed to act with full knowledge of existing case law when it enacts a statute.  A statute must be interpreted in light of the common law and the scheme of jurisprudence existing at the time of its enactment." (citations omitted)).

¶60    In ***Brown County***, our supreme court quoted an earlier opinion regarding the purpose of public hearings as part of the rule-making process:

> "The purpose of a public hearing is to give interested parties not only a chance to be heard, but to have an influence in the final form of the regulations involved. That purpose would not be served if the adopted rules were required to be identical in form to those proposed before the hearing.  A question of the need for an additional hearing might well arise where the rules as adopted bore little resemblance to the rules as proposed."

***Brown Cty.***, 103 Wis. 2d at 54-55 (quoting ***HM Distrib. of Milwaukee v. Department of Agric.***, 55 Wis. 2d 261, 268-69, 198 N.W.2d 598 (1972)).

¶61    The ***Brown County*** court then framed the issue pertinent here as follows:

> [W]hether the changes in [a rule] reflect the Department's legitimate implementation of the input of the first hearing, or whether the final version [of the rule] so far differs from the proposed version that the first hearing could not be said to have offered an opportunity for interested parties to influence the final outcome.[19]

---

[19] More recently, we have stated that "[p]ublic comment may cause the agency to prepare successive drafts, which require additional notice and public hearings."  *See Coyne v. Walker*, 2015 WI App 21, ¶18, 361 Wis. 2d 225, 862 N.W.2d 606, *aff'd*, 2016 WI 38, ¶18, 368 Wis. 2d 444, 879 N.W.2d 520, *overruled by Koschkee v. Taylor*, 2019 WI 76, ¶8, 387 Wis. 2d 552, 929 N.W.2d 600.  Assuming without deciding that our decision in *Coyne* remains good law, we do not interpret our statement there to require an agency to hold a new public hearing for *all* successive rule drafts prompted by public comments.  Instead, we interpret it to be a reference to other means of requiring a new hearing—such as through restarting the rule-making process with a revised scope statement when necessary, or under the considerations discussed in *Brown Cty.*, 103 Wis. 2d at 54-55, and *HM Distributors of Milwaukee v. Department of Agriculture*, 55 Wis. 2d 261, 268-69, 198 N.W.2d 598 (1972).  Interpreting the statement otherwise would cut against the logic of our supreme court's statement in *HM Distributors*, quoted in *Brown County*, that a draft of a rule need not necessarily remain nearly identical to the pre-hearing draft of the rule in order to avoid the need for an additional public hearing.

*Id.* at 55. The court determined that, in that case, changes to the draft rule did not require a second hearing for public comment, noting that "[t]he scope of the notice [for the public hearing] was broad enough to alert the [rule-challenging party] that its interests might be affected." *Id.* at 55.

¶62 The LLC contends that the final draft rule here accomplishes the opposite of what the initial draft rule purported to do, and that, under the rationale in *Brown County*, such opposite effects must trigger the requirement of a new hearing. We are not persuaded.

¶63 As a factual premise for its argument, the LLC contends that the Department went from effectively proposing to lower taxes for a subset of easement program land under the initial draft rule to essentially maintaining the higher-taxed classification for the same subset under the changed draft. Elements of the LLC's premise are accurate. There is no dispute that any tightening or loosening of criteria in the initial draft rule would have had the effect of shifting which easement enrollees receive the lower agricultural use taxation and which receive the higher undeveloped market-based taxation. And, it is undisputed that under the amended rule as adopted landowners with permanent easements who are unable to obtain compatible use authorizations from federal or state officials will see a significant change in their prospective property tax liabilities from those that would have existed under the initial draft rule. However, the notice of hearing and scope statement that the Department published alerted interested parties to the nature of the proposed rule making. In the words of the hearing notice, the purpose of the rule-making process was to "identify general criteria for determining what land that is in federal and state pollution control and soil erosion programs qualifies for agricultural use" to "provide consistency and clear standards for property owners and assessors." 686B Wis. Admin. Reg. 49-50.

29

Some interested parties, including the LLC, took advantage of the public hearing to voice their support for broader criteria by favoring the initial version of the draft rule and by explaining the allegedly harmful effects of the pre-rule-change use classifications that treated their easements as undeveloped.

¶64 Indeed, the change from the initial draft rule to the changed draft rule was in line with at least one comment given during the public hearing, which aligned with separate written comments, taking a different position than the LLC. As the Department notes, one commenter representing several agricultural interest groups voiced opposition to the particular provision in the initial draft rule that granted use value assessment to lands in permanent easements, even when the lands' owners lacked compatible use authorizations and therefore could not engage in any agricultural activities. Written comments submitted by representatives of similar agricultural groups took the same position. In its summary to the legislature of all comments on the changed draft rule, the Department explained that it changed the rule in response to "concerns raised by representatives of agricultural groups that the proposed rule allowed land permanently removed from agricultural production to receive [agricultural] use value assessment." The LLC does not dispute that the Department had discretion to consider these particular comments to be more persuasive than other comments pushing in other directions.

¶65 For these reasons, we see no basis under the law identified by the LLC to conclude that the Department violated proper rule-making procedure by failing to hold a hearing for public comment following its changes to the draft rule.

### D. Necessity Of Revised Economic Impact Analysis

¶66     The LLC contends that the Department was obligated under WIS. STAT. § 227.137(4) to revise the economic impact analysis it created in conjunction with the initial draft rule to address evidence of "significant" changes in tax consequences between the initial draft rule and the changed draft rule.[20] *See* § 227.137(2), (4).  The LLC argues that it has identified evidence that rebuts the presumption that the Department complied with rule-making procedure when it failed to revise its economic impact analysis.  We disagree.  The evidence that the LLC points to regarding the economic effects changed by the shift from the initial draft rule to the changed draft rule fails to support even the beginning of what would be a developed argument under pertinent legal standards.   Before explaining this conclusion, we describe WIS. STAT. § 227.137 in more detail and provide additional background regarding the economic impact analysis prepared here.

¶67     Before submitting a draft rule to the legislature and governor for final approval, the agency must "prepare an economic impact analysis" for that rule.  WIS. STAT. § 227.137(2), (4).  Subsection (3) of § 227.137 describes in broad terms the information that must be included in the economic impact analysis, and how the agency "shall" gather that information, including the solicitation of information from individuals, businesses, and local government

---

[20] The LLC bases its argument for a revised economic impact analysis on evidence contained in the rule-making record submitted to the circuit court by the Department and to materials included as exhibits to affidavits submitted by the LLC.  The Department does not argue that any of the evidence in the LLC's affidavits was improperly before the circuit court or improperly before us on appeal.

units that may be affected by the draft rule. The same subsection further requires that every economic impact analysis "shall include all" of several enumerated analyses. *See, e.g.*, § 227.137(3)(b) (requiring inclusion of "[a]n analysis and detailed quantification of the economic impact of the proposed rule, including the implementation and compliance costs").

¶68 Under WIS. STAT. § 227.137(4), "[i]f a proposed rule is modified after the economic impact analysis is submitted under this subsection so that the economic impact of the proposed rule is significantly changed, the agency shall prepare a revised economic impact analysis for the proposed rule as modified." If a revised economic impact analysis is necessary, the agency prepares it in the same manner as the initial analysis. *Id.*

¶69 The Department here prepared an economic impact analysis based in part on comments regarding the initial draft rule that the Department solicited from interested parties. *See* 646B Wis. Admin. Reg. 50-51. The analysis stated that "[t]he rule provides clarification regarding what land in federal and state pollution control and soil erosion programs qualify as agricultural land for purposes of agricultural use assessment." *Id.* at 51. The analysis further provided that "[t]o the extent that a farmer's land can shift from 'undeveloped' to 'agricultural' as a result of the rule, his or her property taxes will decrease." *Id.*

¶70 The analysis also stated that the Department was unaware of what quantity of easement land would qualify under the criteria of the initial draft rule, but estimated that if "all such land qualifies," at most 87,000 acres would change from the undeveloped to the agricultural tax classification. *Id.* According to the analysis, such a change would have resulted in an estimated $40 million total reduction in taxable property value across the state. *Id.* Using, in part, the

Department's maximum estimated shift in acreage, the analysis further estimated that the initial draft rule would shift a total tax burden of at most $725,000 off of qualifying easement lands and onto other taxable property. *Id.*

¶71 Importantly, the LLC does not challenge the sufficiency of the analysis as it relates to the initial draft rule under WIS. STAT. § 227.137(2)-(3). Nor does the LLC challenge the accuracy of any figure in the analysis.

¶72 The LLC's core argument is the following. Across the state, some number of "family farms" and farms owned by small businesses with the same types of permanent easements as the LLC will, if they cannot obtain compatible use authorizations, be taxed significantly higher under the changed draft rule than they would have been under the initial draft rule. There is a basis for this argument, noted above. There is no dispute that, all other circumstances being equal, farm owners holding permanent easements that qualified under the initial version of the draft rule, but who could not obtain compatible use authorizations to qualify under the final version, saw a significant increase in their tax bills going forward over what their tax burden would have been under the initial draft. For those particular farm owners, at least, the rule change certainly could have had an economic impact.

¶73 However, assuming without deciding that this may qualify as the type of changed economic impact contemplated by WIS. STAT. § 227.137(4), we reject the LLC's argument based on a lack of factual development. That is, the LLC fails to establish undisputed facts from the record that would allow us to assess to any degree of specificity whether the change in economic effects were significant due to the draft rule change. Missing from the LLC's argument is any

potential basis in the record to assess the significance of the change in economic impact that the LLC argues was caused by the rule change.

¶74    The LLC asserts that the revision from the initial draft rule to the changed draft rule resulted in a "60%" reduction in the amount of total acreage that could shift from undeveloped to agricultural use classification—that is, 60% less acreage was in line to get a tax break.  This is apparently based on the LLC's assertion that the total acreage of the LLC's federal program land was, at the pertinent time, approximately 55,600 acres, which would constitute roughly 64% of the estimated total of 87,000 acres of easement land discussed in the economic impact analysis prepared by the Department.[21]  Apart from this, the LLC points only to anecdotal comments made by individual farmers and municipal representatives regarding how the initial draft rule would affect them specifically, and to the undisputed point that the taxation of undeveloped land is significantly higher than the taxation of agricultural land.

¶75    Assuming the accuracy of the LLC's figures for the LLC's federal program land acreage, its "60%" change theory assumes that at least a substantial amount of that land enrolled by the LLC and others in the federal program will be

---

[21] At oral argument, the LLC acknowledged that its briefing on appeal cited a 2006 figure of 44,000 for the total acreage in the federal program in Wisconsin.  The LLC asserted at oral argument that 55,600 acres was a more up-to-date figure.  However, at oral argument the LLC did not cite to any place in the record for this figure, and it also fails to provide any such citation in its appellate briefing. We question whether the LLC has provided sufficient evidentiary support for the accuracy of either figure for summary judgment purposes.  *See* WIS. STAT. § 802.08(3) (evidence relied upon for summary judgment must be admissible, and leave no genuine issue of material fact).  However, setting aside potential problems of record support, as we explain in the text, whatever the accurate figure might be, the total acreage in the LLC's federal program is insufficiently specific to demonstrate the change in economic impact caused by the change to the draft rule.

excluded from "agricultural use" in a given year under the final draft rule.  The LLC fails to substantiate this assumption in two critical ways.  First, the LLC fails to point to evidence showing how much of the federal program acreage consists of temporary easements, which to repeat are generally included within the final draft rule's definition of "agricultural use."  *See* § Tax 18.05(1)(d)3.a.  Second, the LLC fails to point to a basis to determine how frequently federal program administrators might authorize compatible uses, which as explained above would also bring such easements into the definition of "agricultural use."  *See* § Tax 18.05(1)(d)3.b.

¶76    Indeed, the LLC's arguments apparently depend on the unsupported assumption that it is virtually impossible to obtain compatible use authorization from the federal administrator of these programs.  The record indicates, however, that the LLC was able to obtain a compatible use authorization for at least some of its federal easement land for at least one year.  The LLC does not address this authorized compatible use.  Thus, even now the LLC appears unable to show that such a compatible use authorization is a rare occurrence, or to show that compatible uses specifically available to owners of land in the LLC's federal easement program could not somehow fit the permanent-easement criterion for "agricultural use" in § Tax 18.05(1)(d)3.b.

¶77    We now explain why we reject two other arguments the LLC makes on the economic impact analysis issue.  The LLC first asserts that the existing economic impact analysis communicated to owners of land enrolled in the LLC's federal easement program that they should all expect that their property taxes would go down, and that the changed draft rule "reversed" that expectation.  It appears true that aspects of the economic impact analysis would have changed had the Department considered the changed rule's addition of the agricultural use

35

criterion limiting the inclusion of permanent easements. However, the existing analysis did not communicate the expectation asserted by the LLC. We cannot say how much the Department's changes to the draft rule would have altered the heavily qualified calculations of the original analysis, which to repeat the LLC even now does not challenge. The existing analysis provided that, "[t]o the extent that a farmer's land can shift from 'undeveloped' to 'agricultural' as a result of the rule, his or her property taxes will decrease," making no specific mention of the LLC's federal easement program. 696B Wis. Admin. Reg. 51 (emphasis added). It is similarly unavailing for the LLC to point to the following statement in a portion of the rule-making record entitled "fiscal estimate form": the "intent of this [draft] rule is to clarify" the circumstances when land under certain conservation easements "will qualify for 'agricultural use value' assessment in the same circumstances as other program land." *Id.* at 52. Setting aside the Department's argument that this statement was part of a different analysis under a distinct statute, *see* WIS. STAT. § 227.14(4) ("Fiscal Estimates"), we fail to see how the statement does not simply reflect a goal to create generalized criteria, so that all pertinent easement lands are assessed according to the same standards.

¶78 The LLC's second argument is based on the requirement that each economic impact analysis must address compliance costs associated with the implementation of a proposed rule change. *See* WIS. STAT. § 227.137(3)(b). The LLC asserts that the changed draft rule altered the reduction in taxable land value from what would have been $40 million under the initial draft rule (based on the economic impact analysis' calculations) to $20 million (based on the LLC's calculations, using 44,000 acres of land enrolled in programs such as the LLC's federal easement program). More specifically, the LLC argues that this change in property value reduction represents a significant change to the information that an

economic impact analysis must contain. *See* § 227.137(3)(b)2. (requiring that economic impact analyses include determinations as to whether "$10,000,000 or more in implementation and compliance costs are reasonably expected to be incurred by or passed along to businesses, local governmental units, and individuals over any 2-year period").

¶79 The LLC's compliance cost argument fails in several respects. First, the argument suffers the same shortcoming as its core argument described above, in that it is based on a figure for the acreage of the LLC's federal easement program that fails to meaningfully distinguish between land enrolled in that program that will qualify for agricultural use and enrolled land that will not qualify. Second, the LLC fails to explain why we should consider changes in taxable property *value* to be an "implementation" or "compliance cost," rather than, say, changes in property *taxes* calculated based on that taxable value, which the LLC does not provide.

¶80 Having rejected the LLC's argument for the above reasons, we need not address the parties' arguments regarding the appropriate interpretation of "significantly changed" "economic impact" under WIS. STAT. § 227.137(4).

¶81 Summing up on all WIS. STAT. ch. 227 issues, we conclude that the LLC has failed to rebut the presumption that the Department complied with ch. 227 and, accordingly, we reverse the circuit court's rulings to the contrary. The Department does not request that we grant summary judgment in its favor dismissing any of the LLC's arguments to invalidate the amended rule based on ch. 227, and therefore we remand for further proceedings in connection with the ch. 227 arguments.

## II. WEPA

¶82    In its cross appeal, the LLC argues that the Department's decision to not prepare an environmental impact statement violated WEPA.  Specifically, the LLC argues that the Department failed to sufficiently investigate whether the draft rule, particularly in its changed form, would have indirect and adverse effects on the environment based on incentives that the rule creates for farmers who have land enrolled in conservation easements.  As we explain below, under controlling case law, we are obligated to reject the LLC's WEPA claim because the LLC concedes that its allegations are premised on only alleged "indirect effects" on the environment.  *See **Wisconsin's Envtl. Decade, Inc. v. DNR***, 115 Wis. 2d 381, 394, 340 N.W.2d 722 (1983) ("The presence of significant indirect effects or cumulative effects … alone does not require an EIS") ("***WED (1983)***").  We summarize the pertinent law, then describe the LLC's claim and explain how its theory of indirect environmental impact is not a "bona fide" WEPA claim triggering the Department's duties to justify its decision to not prepare an environmental impact statement.

¶83    To repeat, WIS. STAT. § 1.11(2) requires that "[a]ll agencies of the state shall" for all "major actions significantly affecting the quality of the human environment" issue a "detailed statement … on" "[t]he environmental impact of the proposed action."  Case law refers to these detailed statements as "Environmental Impact Statement[s]," which we will shorten to "impact statements."  *See, e.g.*, ***Wisconsin's Envtl. Decade, Inc. v. PSC***, 79 Wis. 2d 409, 413, 256 N.W.2d 159 (1977) ("***WED (1977)***").

¶84    When an agency decides not to prepare an impact statement, we determine whether the decision was "'reasonable under the circumstances.'"  *See*

*WED (1983)*, 115 Wis. 2d at 391 (quoting *WED (1977)*, 79 Wis. 2d at 421). Applying this standard involves a two-step test, under which the agency must develop "'a reviewable record reflecting a preliminary factual investigation'" into the pertinent environmental concerns and justify the decision not to create an impact statement. *State ex rel. Boehm v. DNR*, 174 Wis. 2d 657, 666, 497 N.W.2d 445 (1993) (quoting *WED (1977)*, 79 Wis. 2d at 425); *see also WED (1977)*, 79 Wis. 2d at 424 ("[W]here issues of arguably significant environmental import are raised … the agency must show justification for its" decision not to create an impact statement).

¶85     However, a party challenging the decision not to prepare an impact statement triggers the rule-making agency's burden under this two-part review only by making a "bona fide" allegation of significant environmental effects contemplated by WEPA. *See WED (1977)*, 79 Wis. 2d at 424.

¶86     Controlling our resolution of this issue, our supreme court has stated the following regarding the kinds of effects that render an agency action one that requires an impact statement:

> While the indirect secondary effects may be influential in an [impact statement], they are not necessarily controlling in determining the threshold question of whether an [impact statement] is to be prepared. The presence of significant indirect effects or cumulative effects only increase the need for an [impact statement]; their presence alone does not require an [impact statement].

*WED (1983)*, 115 Wis. 2d at 394.  Applying *WED (1983)* here, it is clear that the LLC's theory of indirect effects of § Tax 18.05(1)(d) on how farmers use easement program lands cannot, on its own, give rise to a bona fide claim under WEPA.  The court in *WED (1983)* did not explain its rationale in detail.  Further, it is not clear to us why the court made such an unqualified statement regarding

"significant indirect effects" given the specific factual context of *WED (1983)*. *See id.* at 404 (ruling that the agency decision not to prepare an impact statement was justified because the agency action at issue involved only "minor changes to the physical environment" as well as "socioeconomic injuries" that lacked "direct causal relationship" to the minor environmental changes). Nevertheless, we cannot disregard the statement that such effects alone are insufficient. *See Zarder v. Humana Ins. Co.*, 2010 WI 35, ¶58, 324 Wis. 2d 325, 782 N.W.2d 682 ("[T]he court of appeals may not dismiss a statement from an opinion by [our supreme] court by concluding that it is dictum."). And, the LLC does not identify any subsequent statements by our supreme court modifying this broad statement in *WED (1983)*. Instead of coming to grips with *WED (1983)*, the LLC addresses only our supreme court's earlier decision in *WED (1977)*.

¶87     In *WED (1977)*, the court determined that it was a bona fide WEPA challenge to allege that the Public Service Commission's decisions setting rates for electric utilities had "significant" and "indirect" environmental effects, based on how the set rates influenced the consumption of electricity across the state. *WED (1977)*, 79 Wis. 2d at 425, 428, 436. It is true that *WED (1977)* can be read in isolation to state that indirect environmental effects, if significant, could be sufficient on their own to trigger agency duties under WEPA. *See id.* at 428 ("Any construction limiting [WEPA] to direct environmental effects would be contrary to its manifest intent."). The LLC points in particular to *WED (1977)*'s rejection of the notion "that only direct environmental consequences need be considered" under the WEPA. *See id.* at 428. However, the LLC fails to acknowledge that, regardless of what effects may be considered, the presence of "significant indirect effects or cumulative effects" alone do not require an impact statement under *WED (1983)*, 115 Wis. 2d at 394.

40

¶88   Although *WED (1983)* does not explicitly modify or withdraw any part of our supreme court's earlier decision in *WED (1977)*, the broad statement in *WED (1983)* regarding "significant indirect effects or cumulative effects" appears to be in tension with aspects of the reasoning in *WED (1977)*.  We clarify, however, that we do not attempt to fully resolve the degree to which a WEPA petitioner may allege a bona fide claim of significant environmental harms following the example of *WED (1977)* in light of the broad, later-in-time discussion of "significant indirect effects or cumulative effects" in *WED (1983)*.  Rather, as we now explain, it is sufficient to resolve this issue to note that the LLC concedes that its allegations of environmental harm consist entirely of indirect effects, and that the LLC's claims of environmental harms are distinguishable from those made in *WEPA (1977)*.[22]

¶89   In the words of the LLC's briefing, its "WEPA complaint is grounded in a change to tax policy that is *indirectly* responsible for the destruction and degradation of wetlands enrolled in federal, non-qualifying easements." (Emphasis in the LLC's brief.)  The LLC does not argue that § Tax 18.05(1)(d) directly affects the environment in the sense that the rule actually restricts how farmers use land enrolled in conservation easements, or that it prevents farmers from enrolling land in any particular easement program.  As we now summarize, we discern the LLC to specifically allege two types of environmental harm resulting from amended § Tax 18.05(1)(d).  In order to understand both types of

---

[22] We need not address the topic of cumulative impacts as addressed in *Wisconsin's Environmental Decade, Inc. v. PSC*, 79 Wis. 2d 409, 256 N.W.2d 159 (1977) ("*WED (1977)*"), and *Wisconsin's Environmental Decade, Inc. v. DNR*, 115 Wis. 2d 381, 340 N.W.2d 722 (1983) ("*WED (1983)*"), or as may apply to the LLC's claim.

41

allegations, it is necessary to know that they both depend on a common assumption: conservation easement lands, particularly wetlands, are always degraded by active agricultural activity such as haying or pasturing of livestock.

¶90 The first of the environmental effects alleged by the LLC is that permanent easement lands are degraded when farmer-owners engage in cropping and grazing practices in violation of easement terms. Farmer-owners of permanent easements do this, the LLC contends, with the goal of causing county tax assessors to *misclassify* their lands as agricultural even where no compatible use authorization had been granted by an easement administrator. However, the LLC provides no support for the proposition that WEPA requires an agency to consider how the results of its rule making may encourage farmers outside the control of the agency to *violate* easement terms on a significant scale. To state the obvious, this would occur on a significant scale only in the absence of meaningful enforcement of easement terms by program administrators.

¶91 Further, the LLC's argument appears to run contrary to the general proposition, explained by our supreme court, that in assessing whether to prepare an impact statement an agency may reasonably assume "that any environmental consequences will be controlled through compliance with the applicable administrative code provisions." *See Boehm*, 174 Wis. 2d at 676. For example, the Department may assume that owners of land subject to permanent easements in the streambank protection program will abide by regulations imposed on such land by the program's administrator, the DNR. *See* WIS. STAT. § 23.094(3) (DNR may acquire permanent easements for program); WIS. ADMIN. CODE §§ NR 51.64,

51.65(1) (prohibiting certain activities in easement, including grazing, unless permitted by DNR); *see also* 7 C.F.R. §§ 1467.15, 1468.39 (describing remedies for violations of the LLC's federal easement program). [23]

¶92    The LLC's second type of allegation of adverse environmental impact is that, by limiting agricultural use classification of permanent easements to those with compatible use authorizations, the Department effectively increased the demand for those authorizations, which in turn will lead to increased use of easement lands for such activities as haying and grazing.  However, it is the administrators of easement programs, not Department representatives, who control the issuance of compatible use authorizations.  *See, e.g.*, WIS. ADMIN. CODE § NR 51.65(1)(b)-(c) (allowing planting or grazing on easement land only where "specifically approved by" DNR); 7 C.F.R. §§ 1467.11, 1468.37 (describing provision of compatible use authorization in the LLC's federal program). Moreover, at least as some easement program administrators purport to define these authorized uses, they are by definition *compatible* with the purposes of the easement, including whatever environmental benefits are intended.  Further, to repeat, the Department interprets § Tax 18.05(1)(d) to grant farmers agricultural use taxation on permanent easement land by obtaining compatible use authorization, even when farmers decide not to engage in the authorized practice.

---

[23] Because, as explained in the text, we reject the LLC's WEPA argument based on its concession that it alleges only indirect environmental effects, we need not address the LLC's numerous purported examples of evidence of indirect effects.  However, we note that the defect is in the nature of the claimed effects, not because the LLC's evidentiary claims are inadequate. Indeed, the LLC's burden is merely to *allege* facts constituting a bona fide claim to trigger scrutiny of the Department's actions under WEPA, and this does not amount to a duty to *prove* its allegations.  *See **WED (1977)***, 79 Wis. 2d at 424 & n.14 ("agency may not shift to petitioners … the duty of environmental inquiry placed upon the agency by statute," nor may agencies "ignore such investigations as others may undertake voluntarily").

The LLC does not contest this interpretation. Further, the LLC fails to come to grips with the fact that farmers receiving such authorization ultimately choose to engage in the authorized activities or not, based in part on economic influences outside of the Department's control.

¶93   In sum, the LLC's particular WEPA allegations are based solely on indirect environmental effects that are caused by circumstances outside the control of the Department. *See USDOT v. Public Citizen*, 541 U.S. 752, 770 (holding "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect").[24]   Based on this, under *WED (1983)*, the LLC fails to state a bona fide WEPA claim triggering scrutiny of the Department's decision not to prepare an impact statement for the promulgation of § Tax 18.05(1)(d).

¶94   As noted, the LLC's only discussion on the topic of direct-versus-indirect environmental effects is based on *WED (1977)*, without addressing *WED (1983)*. However, as should be obvious from our discussion above, the facts of *WED (1977)* are distinguishable from the facts here. In *WED (1977)*, no institutional actor provided an intermediary link in the causal chain between the Public Service Commission's actions at issue and alleged environmental harms caused by end-point energy consumers. Moreover, the environmental harms

---

[24] "Because WEPA was patterned on the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1970), federal law construing NEPA is persuasive authority." *Clean Wisconsin, Inc. v. PSC*, 2005 WI 93, ¶188 n.43, 282 Wis. 2d 250, 700 N.W.2d 768 (citing *WED (1977)*, 79 Wis. 2d at 174).

alleged there did not depend on widespread violation of applicable rules and regulations.

¶95    To summarize our resolution of the WEPA issue, we affirm the circuit court's rejection of the LLC's WEPA claim as an additional basis for summary judgment, and do not need to address additional WEPA arguments advanced by the Department.

¶96    Although we reverse the grant of summary judgment in the LLC's favor based on WIS. STAT. ch. 227 issues and affirm the rejection of the LLC's WEPA argument, the Department acknowledges that we must remand for consideration of claims raised by the LLC not addressed in this appeal.

## CONCLUSION

¶97    For the above reasons, we reverse the circuit court's order voiding WIS. ADMIN. CODE § Tax 18.05(1)(d), affirm its ruling rejecting the LLC's WEPA argument, and remand for proceedings consistent with this opinion.

*By the Court*.—Order affirmed in part; reversed in part and cause remanded.